UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
JOSE VELAZQUEZ,

                Petitioner,

    - against -

THOMAS POOLE,

                Respondent.
-------------------------------------------------X

**REPORT AND
RECOMMENDATION**

04 CV 478 (ENV)

On January 29, 2004, petitioner Jose Velazquez, proceeding pro se, filed this petition for a writ of habeas corpus,[1] pursuant to 28 U.S.C. § 2254, alleging that: (1) the prosecutor's summation was improper; (2) certain evidence elicited by the prosecutor was inadmissible and unconstitutionally prejudicial; (3) the photo array and line-up identifications were impermissibly suggestive; (4) the prosecutor's loss of one of the photo arrays and the poor quality of the photocopy of the line-up photograph deprived petitioner of his state law right to appellate review; (5) the indictment was insufficient and he was denied due process of law during the grand jury proceedings; (6) the prosecutor acted improperly during the grand jury process; (7) the prosecutor withheld exculpatory evidence and elicited perjured testimony during trial; (8) petitioner was illegally arrested; (9) he received ineffective assistance of counsel; and (10) various other claims not discussed in detail.

The petition has been referred to the undersigned to prepare a Report and Recommendation.

---

[1]At the time petitioner initiated this action, he was incarcerated at Five Points Correctional Facility under the supervision of Thomas Poole. It now appears that petitioner is incarcerated at Eastern Correctional Facility under the supervision of William Brown.

## FACTUAL BACKGROUND

On December 6, 1997, petitioner, an off-duty New York City Police Officer, allegedly forced Jennifer Justiniano, a fifteen year old girl, into his van at gun-point and drove her to Forest Park. (Tarbutton Aff. ¶¶ 4, 5).[2] Petitioner then ordered the victim to the rear of the van where he sexually assaulted her. (Id. ¶ 5). Afterward, he drove out of Forest Park and ordered the victim out of the van. (Id. ¶ 6). The victim's mother subsequently took her to the hospital, where a rape kit was prepared. (Id.)

Several weeks later, on December 31, 1997, petitioner allegedly pulled his van up alongside another teenage girl, Zahira Hussein, pointed a silver gun at her, and demanded that she get into his van. (Id. ¶ 7). Ms. Hussein fled before she could be forced into the van. (Id.)

Both girls were subsequently shown a photo array consisting of a total of twelve photographs. (Id. ¶ 8). They each identified the petitioner, and also identified his van as the vehicle used in the crimes. (Id.) Following petitioner's arrest, both girls positively identified petitioner in a line-up, which was conducted in the presence of petitioner's counsel. (Id.)

Petitioner was subsequently charged with Sodomy in the First Degree, in violation of Penal Law § 130.50[1]; Attempted Rape in the First Degree, in violation of Penal Law § 110/130.35[1]; Sexual Abuse in the First Degree, in violation of Penal Law § 130.65[1]; Unlawful Imprisonment in the First Degree, in violation of Penal Law § 135.10; Endangering the Welfare of a Child, in violation of Penal Law § 260.10[1]; and two counts of Menacing in the Second Degree, in violation of Penal Law § 120.14[1]. (Tarbutton Aff. ¶ 9).

---

[2]Citations to "Tarbutton Aff." refer to the Affidavit of Assistant District Attorney ("ADA") Michael Tarbutton, dated November 26, 2004.

Prior to trial, petitioner filed a motion to suppress the line-up identifications on the ground that they were unduly suggestive and tainted by the earlier, allegedly suggestive, photo array procedure. (Id. ¶ 10). On January 6, 1999, the Supreme Court, Queens County, held a suppression hearing, and ultimately denied petitioner's motion to suppress. (Id.)

Petitioner proceeded to a jury trial before the Honorable Richard L. Buchter. (Id. ¶ 11). The evidence presented at trial included the out-of-court line-up identifications made by both victims and certain serological evidence developed from semen recovered from Jennifer Justiniano and from a T-shirt recovered from petitioner's van.[3] (Id. ¶¶ 11, 12). The two victims also made in-court identifications of petitioner, identified his van, and the first victim described the interior of the van and identified several objects found in the van. (Id. ¶ 11).

On May 16, 2000, the jury convicted petitioner of Sodomy in the First Degree, Attempted Rape in the First Degree, Sexual Abuse in the First Degree, Unlawful Imprisonment in the First Degree, Endangering the Welfare of a Child, and two counts of Menacing in the Second Degree. (Id. ¶ 15). Petitioner was sentenced on June 5, 2000, receiving determinate prison terms of twenty-two years on the sodomy count, ten years on the attempted rape count, and seven years on the sexual abuse count. (Id. ¶ 16). Petitioner also received an indeterminate term of one and one-third to four years on the unlawful imprisonment count, and definite terms of one year each

_____

[3]Although there was no DNA identified in the semen sample taken from the victim (id. ¶ 13), one of the prosecution's experts indicated that the antigen profile in the semen samples taken from an article of the victim's clothing was consistent with that of petitioner and excluded 96% of the male population as potential sources of the semen. (Id. ¶ 12). The DNA expert explained that in the case of semen samples, DNA is recovered from the sperm cells carried within the semen. (See Tr. at 465). A stipulation entered into by the parties indicated that, as a result of a vasectomy undergone by the petitioner prior to December 1997, the petitioner was unable to produce sperm but could still produce semen. (Id. at 1113).

for the two menacing counts and for the endangerment count. (Id.) Under the sentence imposed by the court, all terms were to run concurrently. (Id.)

In November 2001, petitioner, through counsel, filed a brief in support of his appeal to the Appellate Division, Second Department, asserting two claims. (Id. ¶ 17). He first claimed that he was denied a fair trial because the prosecutor elicited testimony regarding Ms. Justiniano's emotional state after the incident and because the prosecutor made certain improper comments made during the summation. (Id. ¶ 17(a)). Petitioner's second claim was that the line-up identification should have been suppressed because the District Attorney's Office lost one of the arrays, provided appellate counsel with an indiscernible photocopy of the photograph of the line-up, and because the line-up was impermissibly suggestive. (Id. ¶ 17(b)).

While the appeal was still pending, petitioner filed a pro se supplemental brief raising several additional claims, including claims that: (1) the indictment failed to provide fair notice of the charged crimes; (2) there was insufficient evidence to support the indictment; (3) the grand jury process was impaired because petitioner was not given the opportunity to testify and because the prosecutor failed to present certain exculpatory evidence to the grand jury; and (4) the charges should have been severed because they involved different victims on different days. (Id. ¶ 18).

The Appellate Division issued its decision on November 18, 2002, affirming petitioner's conviction and specifically ruling that petitioner's motion to suppress the identification testimony was properly denied. People v. Velazquez, 299 A.D.2d 500, 749 N.Y.S.2d 740 (2d Dep't 2002). As to petitioner's other claims, including those raised in his pro se supplemental brief, the Appellate Division found them to be "without merit." Id.

4

Petitioner's counsel thereafter filed a motion to reargue the appeal, contending that the loss of one of the photo arrays and the original line-up photographs prejudiced petitioner's right to appeal his conviction. (Tarbutton Aff. ¶ 20). According to the respondent, the Second Department denied petitioner's motion to reargue the appeal.[4] (Id. ¶ 21).

On January 13, 2003, while the motion for reargument was pending, petitioner sought leave to appeal to the New York State Court of Appeals. (Id. ¶ 22). In that application, petitioner sought leave to appeal his claim that the identification procedure was suggestive; that the loss of the photo array and line-up photographs prejudiced his right to appeal; and that the prosecutor committed misconduct in vouching for a witness' credibility. (Id.) Petitioner also sought leave to appeal from the Appellate Division's determination of the various claims raised in petitioner's pro se supplemental brief. (Id.)[5] Leave to appeal was denied on February 3, 2003. See People v. Velazquez, 99 N.Y.2d 620, 787 N.E.2d 1178, 757 N.Y.S.2d 832 (2003).

Petitioner also filed a motion in Supreme Court, Queens County, seeking to vacate his conviction pursuant to Section 440.10 of New York's Criminal Procedure Law. (Tarbutton Aff. ¶ 25). In that motion, which was filed pro se on July 25, 2002 while his direct appeal was pending before the Appellate Division, petitioner raised several claims. He argued that: (1) the prosecutor had concealed exculpatory information from the grand jury and participated in the

---

[4]The petitioner alleges that the Appellate Division never issued a decision concerning his motion for reargument. (See discussion infra at 71-74). Neither party submitted a copy of the decision to the Court, and the Court could not locate the decision in the legal databases to which it has access.

[5]While the respondent alleges that petitioner failed to include all of his arguments concerning the prosecutor's summation and his claim that the prosecutor improperly elicited certain testimony in his application for leave to appeal (id. ¶ 23), the Court finds that these claims were raised in his application to the Court of Appeals. (See discussion infra at 18-19, 27-28).

presentation of perjurious testimony; (2) the photo array was suggestive; (3) the police lacked probable cause to arrest; and (4) he received ineffective assistance of counsel. (Id.) On December 3, 2002, petitioner's post-judgment motion was denied by the State Supreme Court. (Id. ¶ 26). The State Supreme Court found that since the claims relating to the photo array and the prosecutor's conduct before the grand jury were amenable to direct review by the Appellate Division, and had in fact been ruled on while the post-judgment motion was pending, the Supreme Court had no authority to consider these claims. (See Decision of Dec. 3, 2002 at 2). Similarly, the Supreme Court held that the third claim, based on an alleged lack of probable cause to arrest, was also subject to direct review. Therefore, the court held that petitioner's unjustifiable failure to raise that argument on direct appeal similarly barred its collateral review. (Id.) Finally, with respect to petitioner's claim of ineffective assistance of counsel, the court found no evidentiary support for petitioner's claim that his attorney erred by failing to call alibi witnesses or by failing to disclose certain exculpatory material to petitioner. (Id.) In denying petitioner's claim of ineffective assistance of counsel, the court cited N.Y. Crim. Proc. Law § 440.30(4)(b),[6] which authorizes denial of a motion to vacate judgment without a hearing if the defendant fails to submit a sworn statement attesting to facts essential to sustain his claims. (Id. at 2-3). The court further noted, however, that even if petitioner's claims were assumed to be true, he had nonetheless failed to establish that these decisions by counsel were an unreasonable exercise of professional judgment. (Id. at 3).

---

[6]Specifically, Section 440.30(4)(b) provides that "[u]pon considering the merits of the motion, the court may deny it without conducting a hearing" if the "motion is based upon the existence or occurrence of facts and the moving papers do not contain sworn allegations substantiating or tending to substantiate all the essential facts" as required by other provisions governing the motion to vacate judgment procedure. N.Y. Crim. Proc. Law § 440.30(4)(b).

Petitioner then sought leave to appeal from the denial of his post-judgment motion. (Tarbutton Aff. ¶ 31). Included among the exhibits that petitioner submitted to the Appellate Division in support of his application for leave to appeal were letters from petitioner's step-daughter and wife, each of whom claimed to have been with petitioner at the time that one or the other attacks occurred. (Id. ¶¶ 31-33).[7] Petitioner's wife's letter further asserted that certain items that the first victim had claimed were in the van at the time of the assault did not belong to petitioner, and were instead planted in his van by the police. (Id. ¶ 34). She also claimed that several police officers knew that her husband's van was broken down in a precinct parking lot at the time of the crime, but that these unnamed officers were unwilling to testify due to intimidation from the Internal Affairs Bureau. (Id.) Finally, she provided an explanation for her husband's semen, which was discovered on the t-shirt recovered from petitioner's van. (Id. ¶ 35).

Petitioner's application for leave to appeal from the Supreme Court's decision on his post-judgment motion to vacate was denied on February 28, 2003 by the Appellate Division, Second Department.[8] (Petr.'s Mem., Ex. P).[9] Thereafter, on April 7, 2003, the Court of Appeals dismissed his subsequently filed leave application on the grounds that, under New York law, there is no appeal from an order of the Appellate Division denying discretionary review.

---

[7]ADA Tarbutton notes that "it is not clear from the records of the District Attorney's Office whether these exhibits were actually before the court that decided defendant's post-judgment motion." (Id. ¶ 31).

[8]The respondent's papers incorrectly indicate that the Appellate Division denied petitioner's application for leave to appeal on December 30, 2002. (Tarbutton Aff. ¶ 36).

[9]Citations to "Petr.'s Mem." refer to Petitioner's Memorandum of Law submitted in support of his petition for a writ of habeas corpus.

(Tarbutton Aff. ¶ 36).

In his current petition for habeas review, petitioner raises many of the same arguments raised in the state court proceedings, but has also added certain new claims.

## DISCUSSION

A.  Timeliness of Petition

The petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (codified as amended in scattered sections of the United States Code)[10] which provides that a "1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d)(1).  This limitation, absent certain exceptions which do not apply to this case, runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).  A conviction is deemed final for AEDPA purposes when the defendant's time to seek certiorari before the United States Supreme Court has expired.  See Williams v. Artuz, 237 F.3d 147, 151 (2d Cir. 2001).[11]  Moreover, any "time during which a properly filed application for State post-conviction or other collateral review . . . is pending" is excluded from the calculation of the statute of limitations period.  28 U.S.C. § 2244(d)(2).

---

[10] This case is governed by AEDPA's revisions to the law of habeas corpus because the petition was filed on January 29, 2004, after the effective date of the Act. See Williams v. Taylor, 529 U.S. 362, 402 (2000); see also Overton v. Newton, 146 F. Supp. 2d 267, 272 (E.D.N.Y. 2001), judgment rev'd on other grounds, 295 F.3d 270 (2d Cir. 2002).

[11] If the defendant files a petition with the United States Supreme Court, the conviction is final when certiorari proceedings have concluded. Id.

Petitioner's direct appeal to the Appellate Division was denied on November 18, 2002, see People v. Velazquez, 299 A.D.2d 500, 749 N.Y.S.2d 740, and his application for leave to appeal to the Court of Appeals was denied on February 3, 2003. People v. Velazquez, 99 N.Y.2d 620, 787 N.E.2d 1178, 757 N.Y.S.2d 832. Under Rule 13 of the Rules of the Supreme Court of the United States, petitioner's conviction became final 90 days after the Court of Appeals issued its decision denying leave to appeal.[12] Even without any qualified applications for state post-conviction review,[13] petitioner's statute of limitations would have expired on May 4, 2004. Since his petition was filed on January 29, 2004, he was clearly within the one-year statute of limitations set by AEDPA, and his petition is timely before this Court.

## B. Exhaustion of Petitioner's Claims

### 1) Standards - Exhaustion

Before considering the merits of petitioner's claims, this Court must first determine if petitioner has exhausted all available state remedies and whether federal habeas review is permissible. The State argues that petitioner has failed to exhaust certain claims, either by failing entirely to raise them before the state courts or by failing to present them to the state courts in terms of federal constitutional violations, and is thus procedurally barred from pursuing those claims in this federal petition.

A petition for a writ of habeas corpus may not be granted unless all available state court

---

[12]Rule 13 indicates that a petition for a writ of certiorari is timely when filed within 90 days after entry of judgment. The petitioner did not seek such relief.

[13]In fact, petitioner had "properly filed" applications for state collateral review that would toll AEDPA's statute of the limitations.

remedies have been exhausted. See 28 U.S.C. § 2254(b)(1)(A); Picard v. Connor, 404 U.S. 270, 275-76 (1971); Ellman v. Davis, 42 F.3d 144, 147 (2d Cir. 1994), cert. denied, 515 U.S. 1118 (1995). This rule is based on principles of comity between state and federal courts, and requires that the state be given "the first opportunity to address and correct alleged violations of state prisoner's federal rights." Coleman v. Thompson, 501 U.S. 722, 731 (1991); accord Picard v. Connor, 404 U.S. at 275-76. "To fulfill the exhaustion requirement, a petitioner must have presented the substance of his federal claims 'to the highest court of the pertinent state.'" Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994) (quoting Pesina v. Johnson, 913 F.2d 53, 54 (2d Cir. 1990)), cert. denied, 514 U.S. 1054 (1995). "'In order to have fairly presented his federal claim to the state courts[,] the petitioner must have informed the state court of both the factual and the legal premises of the claim he asserts in federal court.'" Harmon v. People, No. 97 CV 2539, 1999 WL 458171, at *2 (E.D.N.Y. June 25, 1999) (quoting Daye v. Attorney Gen. of State of New York, 696 F.2d 186, 191 (2d Cir. 1982) (en banc)).

Petitioner satisfies the exhaustion requirement if he has presented his claim to the appropriate state courts in accordance with state procedural requirements, and has thereby "afford[ed] the state courts a meaningful opportunity to consider [the] allegations of legal error." Vasquez v. Hillery, 474 U.S. 254, 257 (1986) (internal citation omitted). Although some courts have insisted upon citation in the state pleadings to a specific clause of the Federal Constitution that is alleged to have been violated, courts in this Circuit have held that a claim may be "fairly present[ed] to the state courts . . . without citing chapter and verse of the Constitution" if there is "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis [in factually similar circumstances], (c) assertion of the

claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." Daye v. Attorney Gen. of State of New York, 696 F.2d at 194; accord Disimone v. Phillips, 461 F.3d 181 (2d Cir. 2006) (internal citations omitted); Jones v. Vacco, 126 F.3d 408, 413-14 (2d Cir. 1997) (holding that "[c]it[ation to] a specific constitutional provision or rel[iance] on federal constitutional precedents alerts state courts of the nature of the claim"); Williams v. Lord, 996 F.2d 1481, 1483 (2d Cir. 1993) (holding that petitioner had fully presented her claim to the state court where, "[a]lthough she did not cite specific constitutional provisions in her [state court] brief[,] . . . she explicitly asserted her constitutional right to present a defense . . . [and] cited a leading Supreme Court case in this area"), cert. denied, 510 U.S. 1120 (1994).

The legal claims raised in the state courts must also be the "substantial equivalent" of the claims raised in the federal petition. See Picard v. Connor, 404 U.S. at 278; accord Waterhouse v. Rodriguez, 848 F.2d 375, 381 (2d Cir. 1988) (noting that "[t]he legal theory relied upon in the federal court need not . . . be identical to the legal theory presented to the state courts, provided that the essential factual allegations and the ultimate constitutional question raised in the federal petition were presented to the state courts"). Once a federal claim has been properly presented to the state courts, the claim is considered exhausted even if the state court did not address the claim on the merits and instead rejected it on a state procedural ground, or did not rule on the claim on either substantive or procedural grounds, but nonetheless had a fair opportunity to address the claim. See, e.g., Coleman v. Thompson, 501 U.S. at 731-32; Castille v. Peoples, 489 U.S. 346, 350-51 (1989).

When analyzing whether a claim has been exhausted, the court "refers only to remedies

still available at the time of the federal petition." Engle v. Issac, 456 U.S. 107, 125 n.28 (1982).

If an avenue in the state courts is currently available, the federal court generally abstains from

habeas review; "[c]onversely, of course, if no state procedure is available for raising any claims

at the time a state prisoner applies for federal relief, the exhaustion requirement is satisfied."

O'Sullivan v. Boerckel, 526 U.S. 838, 851-52 (Stevens, J., dissenting) (setting forth a general

description of the differences between the doctrines of exhaustion and procedural default, with

which the majority expressly noted agreement).


2) Standards - Procedural Default

As a separate and distinct issue, the Court must also address the problem of waiver or

procedural default. See Engle v. Isaac, 456 U.S. at 125 n.28; Francis v. Henderson, 425 U.S. 536

(1976). "[A] federal habeas court need not require that a federal claim be presented to a state

court if it is clear that the state court would hold the claim procedurally barred." Harris v. Reed,

489 U.S. 255, 263 n.9 (1989); see also Reyes v. Keane, 118 F.3d 136, 139 (2d Cir. 1997); Grey

v. Hoke, 933 F.2d 117, 120 (2d Cir. 1991). Where a state procedural bar exists, the petitioner no

longer has any "'remedies available in the courts of the State'" within the meaning of Section

2254(b). See Grey v. Hoke, 933 F.2d at 120 (quoting 28 U.S.C. § 2254(b)). It is well established

that a state procedural rule barring direct review suffices to bar federal habeas review absent a

showing of cause and prejudice. Coleman v. Thompson, 501 U.S. at 750; see also Levine v.

Commissioner of Corr. Servs., 44 F.3d 121, 126 (2d Cir. 1995) (holding that a state procedural

default provides an adequate basis for denying review of a prisoner's habeas petition unless the

petitioner can show "'cause for the default and prejudice resulting therefrom'") (quoting

12

Gonzalez v. Sullivan, 934 F.2d 419, 421 (2d Cir. 1991)); Booker v. Ricks, No. 02 CV 6456, 2006 WL 2239243, at *8 (E.D.N.Y. Aug. 4, 2006). Therefore, the Court must inquire as to whether the petitioner has any remedies remaining in the state court to warrant a stay or dismissal of the petition without prejudice in order to allow exhaustion of the claims that petitioner has not adequately raised in prior proceedings.

C. Stay and Abeyance

Prior to the enactment of AEDPA, a federal court was not to consider the merits of a state prisoner's petitioner for a writ of habeas corpus until all state remedies had been exhausted. 28 U.S.C. § 2254(b), amended by Pub. L. No. 104-132, 110 Stat. 1214. Although the statute did not explicitly address "mixed" petitions, the Supreme Court in Rose v. Lundy, 455 U.S. 509 (1982), held that where a habeas corpus petition contains both exhausted claims and unexhausted claims, the federal court must dismiss the entire petition, not just the individual exhausted claims, pending exhaustion of all claims or deletion of the unexhausted claims from the habeas petition. Id. at 520-22; see also Rhines v. Weber, 544 U.S. 269, 273-74 (2005) (discussing pre-AEDPA procedure for "mixed" petitions). The Court in Rose v. Lundy explained that the doctrine of complete exhaustion was "designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings." 455 U.S. at 518. Indeed, prior to AEDPA's passage, the Second Circuit made clear that "[p]assing on the merits of claims in a habeas petition containing unexhausted claims runs counter to Rose v. Lundy." Levine v. Commissioner of Corr. Servs., 44 F.3d at 125.

With the enactment of AEDPA, however, the "landscape for federal habeas corpus

13

petitions" was "dramatically altered." Rhines v. Weber, 544 U.S. at 274. The exhaustion provisions of the statute were amended to provide that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2). Thus, with the passage of AEDPA, the court is now given discretion to deny unexhausted claims on the merits, although it is not required to do so. See 28 U.S.C. § 2254(b)(2), as amended. AEDPA also imposed a one-year statute of limitations on the filing of federal habeas petitions, making it possible for petitioners who file mixed petitions to "forever los[e] their opportunity for any federal review of their unexhausted claims" if the federal court dismisses their petitions after the statute of limitations expires. Rhines v. Weber, 544 U.S. at 274-75. Although Section 2244(d)(2) mandates that the limitations period is tolled during the pendency of applications for state post-conviction or collateral review, it is not tolled by the filing of a habeas petition. Id.

Thus, following the enactment of AEDPA, courts considering a petition with both exhausted and unexhausted claims have: (1) stayed the mixed petition, see Zarvela v. Artuz, 254 F.3d 374, 380 (2d Cir.) (citing Freeman v. Page, 208 F.3d 572, 577 (7th Cir. 2000)), cert. denied, 534 U.S. 1015 (2001); (2) dismissed the mixed petition, see id. (citing Graham v. Johnson, 168 F.3d 762, 778 (5th Cir. 1999)); or (3) dismissed only the unexhausted claims and stayed the remaining claims. See id. (citing Calderon v. United States Dist. Court, 134 F.3d 981, 986-88 (9th Cir. 1998)). Having considered all three approaches, the Second Circuit in Zarvela v. Artuz concluded that a court "should exercise discretion either to [dismiss the unexhausted claims and] stay further proceedings on the remaining [exhausted] portion of the petition or to dismiss the petition in its entirety." Id. The Zarvela court concluded that staying an action would be "the

14

only appropriate course" if "outright dismissal 'could jeopardize the timeliness of a collateral attack.'" Id. (internal citations omitted).

Concerned that granting a stay could allow a petitioner "an undue amount of time to pursue state court remedies," the Second Circuit instructed that if a court elects to stay a mixed petition, the court "should explicitly condition the stay on the prisoner's pursuing state court remedies within a brief interval, normally 30 days, after the stay is entered and returning to federal court within a similarly brief interval, normally 30 days after state court exhaustion is completed." Id. at 380-81. The Zarvela court instructed that if the petitioner fails to comply with either deadline, the court may vacate the stay nunc pro tunc as of the date the court entered the stay, and may dismiss the petition "unless the time the petitioner has taken to initiate exhaustion in the state courts and to return to federal court after exhaustion has not consumed more than the portion of the one-year limitations period that remained when the habeas petition was initially filed." Id.

Addressing the same issue in Rhines v. Weber, the Supreme Court noted that the procedure of "[s]tay and abeyance, if employed too frequently, has the potential to undermine the[ ] twin purposes" of AEDPA. 544 U.S. at 277. As the Supreme Court detailed:

> [s]taying a federal habeas petition frustrates AEDPA's objective of encouraging finality by allowing a petitioner to delay the resolution of the federal proceedings. It also undermines AEDPA's goal of streamlining federal habeas proceedings by decreasing a petitioner's incentive to exhaust all his claims in state court prior to filing his federal petition.

Id. As a consequence, the Supreme Court held that "stay and abeyance should be available only in limited circumstances." Id. If the "court determines there was good cause for the petitioner's

failure to exhaust his claims first in state court," then the court may grant a stay. Id. However, if the "unexhausted claims are plainly meritless," "the district court would abuse its discretion if it were to grant him a stay," even if the petitioner had established good cause for his failure to exhaust.[14] Id.

### D. Merits - Standards under AEDPA

Under 28 U.S.C. § 2254, as amended by AEDPA, the authority of federal courts to grant writs of habeas corpus on the merits of claims filed by state prisoners is limited to instances in which it can be shown that the adjudication of a claim on the merits in state court (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

In Williams v. Taylor, 529 U.S. at 404-05, the Supreme Court indicated that the "contrary to" and "unreasonable application" clauses of Section 2254(d)(1) have independent meanings. Id. Under the first prong, a state court decision is considered to be "contrary to" clearly established federal law where the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or where the state court "confronts a set of facts that are

_____

[14]Thus, courts in this Circuit have recently denied mixed petitions on the merits where the unexhausted claims "do not appear to have merit," York v. Fischer, No. 04 CV 1467, 2006 U.S. Dist. LEXIS 50225, at *18 (E.D.N.Y. July 21, 2006), are "so patently devoid of merit," Brown v. Perlman, No. 03 CV 2670, 2006 WL 2819654, at *3 (S.D.N.Y. Sept. 29, 2006), or are "plainly meritless." Velez v. Ercole, No. 06 CV 334, 2006 WL 2742046, at *4 (S.D.N.Y. Sept. 26, 2006).

materially indistinguishable" from those considered by the Supreme Court, but "nevertheless arrives at a result different from [Supreme Court] precedent." Id. at 405-06; accord Overton v. Newton, 295 F.3d at 275; Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000). The precedent providing guidance in this analysis are "'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" Overton v. Newton, 295 F.3d at 275-76 (quoting Williams v. Taylor, 529 U.S. at 412).

Under the "unreasonable application" prong of Section 2254(d)(1), a state court decision will be set aside if it involves an "unreasonable application" of the correct governing legal rule to the particular facts of the case, see Williams v. Taylor, 529 U.S. at 407, 409; Overton v. Newton, 295 F.3d at 275, or if the decision "refuses to extend a legal principle that the Supreme Court has clearly established to a new situation in which it should govern." Hoi Man Yung v. Walker, 468 F.3d 169, 176 (2d Cir. 2006) (citing Kennaugh v. Miller, 289 F.3d 36, 45 (2d Cir. 2002)). In conducting this analysis, the appropriate inquiry is whether the decision was objectively unreasonable, not merely whether it was incorrect or erroneous. Williams v. Taylor, 529 U.S. at 409-11. However, while "[s]ome increment of incorrectness beyond error is required[,] . . . [that] increment need not be great; otherwise, habeas relief would be limited to state court decisions 'so far off the mark as to suggest judicial incompetence.'" Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (internal citation omitted); accord Durant v. Strack, 151 F. Supp. 2d 226, 234 (E.D.N.Y. 2001). In Overton, the Second Circuit, in interpreting Williams, reaffirmed its view that "the standard to be applied 'falls somewhere between merely erroneous and unreasonable to all reasonable jurists.'" 295 F.3d at 277 (quoting Jones v. Stinson, 229 F.3d at 119). The Second Circuit also acknowledged that "there has been considerable uncertainty as to how broadly or

narrowly lower courts should construe principles defined by the Supreme Court in order to

determine whether state courts have applied them reasonably." Id.

Under AEDPA, a state court's determination of a factual issue is "presumed to be

correct," 28 U.S.C. § 2254(e)(1); Overton v. Newton, 295 F.3d at 275, and the petitioner has the

"burden of rebutting the presumption of correctness by clear and convincing evidence." 28

U.S.C. § 2254(e)(1). Moreover, "a decision adjudicated on the merits in a state court and based

on a *factual* determination will not be overturned on factual grounds unless objectively

unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v.

Cockrell, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(d)(2)) (emphasis added).


E.  Application

Having reviewed each of the petitioner's claims, the Court finds that his petition for a

writ of habeas corpus should be denied in its entirety.


1)  Prosecutor's Summation

In his Memorandum of Law, petitioner first addresses the claim of prosecutorial

misconduct based on allegedly inflammatory comments made by the prosecutor during

summation. These claims relating to the prosecutor's summation were raised before the

Appellate Division on direct appeal, and were similarly raised in the application for leave to

appeal filed with the Court of Appeals.[15]  (See Def.'s Br. at 23-28;[16] Def.'s Appl. at 5).  Thus,

---

[15]The Court notes that although petitioner's application for leave to appeal details his
preservation of the allegedly improper prosecutorial vouching issue, it also speaks generally of
"prosecutorial misconduct," and cites page numbers that reference the portion of petitioner's

these claims have been fully exhausted and the Court may consider whether they merit <u>habeas</u> relief. 28 U.S.C. § 2254(b)(1)).

Specifically, petitioner argues that he was denied his right to due process when the prosecutor was allowed to elicit testimony from three witnesses about Ms. Justiniano's emotional state after the incident,[17] and was thereafter permitted in summation to interject the integrity of the prosecutor's office to bolster the prosecutor's case. (Petr.'s Mem. at 3-5). Petitioner alleges that, in summation, the prosecutor "appeal[ed] to the jury's sympathy, vouch[ed] for Justiniano's credibility and argu[ed] that . . . the [petitioner] was 'prowling'[18] for additional victims" when he was pulled over by the police. (<u>Id.</u> at 3). The petitioner further alleges that he was denied due process when the prosecutor "suggested that [petitioner] habitually used the van for the purpose of sexual assaults" by referring to a t-shirt with semen on it that was found in the petitioner's van. (<u>See id.</u> at 4). Petitioner appears to be arguing that these comments deprived him of his "right to a fair and objective evaluation of the evidence." (<u>See id.</u> at 3).

_____

brief to the Appellate Division that discusses all of petitioner's claims relating to prosecutorial misconduct in summation. (<u>See</u> Petitioner's Application for Leave to Appeal to the Court of Appeals, dated January 13, 2003 and attached as Exhibit "G" to petitioner's <u>habeas</u> application ("Def.'s Appl.") at 5). Thus, although petitioner's papers did not explicitly recite the claims relating to improper summation, the Court finds that the claims now raised in petitioner's <u>habeas</u> application were raised before the Court of Appeals.

[16]Citations to "Def.'s Br." refer to Petitioner's Brief to the Appellate Division, dated November 2001.

[17]Although petitioner framed his argument about this testimony as to the victim's emotional state in terms of prosecutorial misconduct, his appeal challenged the admissibility of this evidence, and the claim is therefore addressed separately. (<u>See</u> discussion <u>infra</u> at 27-33).

[18]Although the petitioner quotes the prosecutor as using the word "prowling" (Petr.'s Mem. at 3), it appears from the record that the prosecutor actually said that petitioner was "patrolling for other victims." (Tr. at 1227; <u>see</u> discussion <u>infra</u> at 22-24).

19

To obtain relief based on a claim of prosecutorial misconduct, the habeas petitioner must demonstrate that the alleged misconduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)); see also Tankleff v. Senkowski, 135 F.3d 235, 252 (2d Cir. 1998) (noting that in order to grant relief, the habeas court must "find that the prosecutor's comments constituted more than mere trial error, and were instead so egregious as to violate the defendant's due process rights"). Indeed, the Supreme Court has made it clear that a prosecutor's comments in summation must be more than "'undesirable or even universally condemned.'" Darden v. Wainwright, 477 U.S. at 180-81 (internal citations omitted). In determining whether the alleged prosecutorial misconduct amounted to "prejudicial error," courts must review the conduct in the context of the entire trial. Strouse v. Leonardo, 928 F.2d 548, 557 (2d Cir. 1991). The court should examine not only "the severity of the misconduct," but also "the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct." United States v. Friedman, 909 F.2d 705, 709 (2d Cir. 1990) (internal citations omitted). Only if the misconduct deprived the defendant of a fair trial does the misconduct violate the defendant's due process rights. Blissett v. Lefevre, 924 F.2d 434, 440 (2d Cir.) (internal citations omitted), cert. denied, 502 U.S. 852 (1991).

"Attorney statements vouching for the credibility of witnesses are generally improper because they 'imply the existence of extraneous proof.'" United States v. Perez, 144 F.3d 204, 210 (2d Cir. 1998) (internal citations omitted). In assessing petitioner's claim that the prosecutor impermissibly "vouch[ed]" for the credibility of Ms. Justiniano's testimony, a review of the record demonstrates that on various occasions, the prosecutor told the jury that Ms. Justiniano

was "careful," that the jury "can rely on her," or that the jury can "rely on what Jennifer Justiniano said." (Tr. at 1191-92, 1198-99, 1213).[19] Read in context, it appears that the prosecutor was not personally vouching for the witness, but rather arguing to the jury that they should credit the witness's testimony for the reasons provided by the prosecutor. The prosecutor told the jury that in evaluating the victim's credibility, they should consider the detailed description that the witness gave not only of petitioner (id. at 1222), but also of the interior of the petitioner's van. (Id. at 1203-04). The prosecutor referred to the victim's demeanor while she was testifying (id. at 1200-01),[20] and reminded the jury that the victim had a number of opportunities to view petitioner. (Id. at 1192-95, 1202-03, 1206). Thus, "[b]ecause the prosecutor did not 'imply the existence of extraneous proof[,]' we cannot say that [her] statements were an improper vouching for the credibility of [the witness]." United States v. Perez, 144 F.3d at 210.

The phrasing of several of the prosecutor's arguments concerning the victim's credibility indicate even more clearly that the prosecutor was not personally vouching for the victim's

---

[19]By way of example, after discussing Ms. Justiniano's reaction to the photo array and her desire to identify the perpetrator in person, the prosecutor stated: "That's logical and reasonable and that tells you that Jennifer Justiniano is careful and you can rely on her." (Id. at 1197-99). The prosecutor further noted that "when somebody – when Jennifer Justiniano picks him out and doesn't know that that rag is secreted in that compartment, that's another way that you know that you can rely on her because he does have that in his van and he is the one that she picks." (Id. at 1213).

[20]Specifically, the prosecutor stated: "Was she smart, was she articulate, did she listen, was she careful? You had an opportunity to observe her. I submit to you that the way she appeared and the way she testified tells you all those things are true." (Id. at 1201).

testimony.[21] See Sales v. Harris, 675 F.2d 532, 541 (2d Cir.) (highlighting a difference between personally vouching for the credibility of a witness and arguing that a witness is credible), cert. denied, 459 U.S. 876 (1982). By way of example, after one of petitioner's objections, the prosecutor stated: "Your common sense, after listening to Jennifer Justiniano's testimony, leads you to the conclusion that when she points to the defendant and says it's him, she is correct." (Tr. at 1192). She further stated: "That's logical and reasonable and that tells you that Jennifer Justiniano is careful and you can rely on her." (Id. at 1199).

Moreover, the prosecutor's arguments may be seen as a direct response to petitioner's counsel's argument that the victim's testimony was vague and lacking in detail. (See id. at 1180-81). Petitioner's trial counsel also argued that the witness was testifying out of revenge and had "made a wrong [identification] and she is sticking with it." (Id. at 1181); see United States v. Young, 470 U.S. 1, 11-13 (1985) (holding that "[i]n order to make an appropriate assessment" of whether the prosecutor's comments unfairly prejudiced the defendant, the prosecutor's summation must be considered in light of defense counsel's closing arguments); United States v. Perez, 144 F.3d at 210 (indicating that "[p]rosecutors have greater leeway in commenting on the credibility of their witnesses when the defense has attacked that credibility").

As to the prosecutor's comment regarding the petitioner "patrolling" for other victims, the

---

[21]The Court notes that some of the prosecutor's statements were not phrased in a manner that emphasized credibility. At one point, the prosecutor argued: "You didn't need the physical evidence recovered, you didn't need the scientific evidence. You know [the petitioner was the perpetrator] because Jennifer Justiniano told you it was him and you can rely on what Jennifer Justiniano said." (Tr. at 1191). Later, when speaking about Ms. Justiniano, Ms. Hussein, and Detective Kenzik, the prosecutor questioned: "Do they see details? Yes. Can they remember details? Yes. Can they relate the details? Yes." (Id. at 1222). However, the Court further notes that the trial court sustained objections to each of these statements and reminded the jurors to reach their verdict based on the evidence presented in the case. (See discussion infra at 26).

context in which the comment was made indicates that it was likely intended to counter petitioner's counsel's insinuation that the investigating officer, Detective Tepperman, had been negligent in failing to contact the Internal Affairs Bureau ("IAB") upon learning of petitioner's potential involvement in the crimes (see Tr. at 672-75), and was not intended to improperly inflame the jury. After addressing in her re-direct examination the issue of the timing of Detective Tepperman's notification of the IAB and his continued investigatory efforts (id. at 700-04), the prosecutor argued in summation that Detective Tepperman's failure to contact IAB was immaterial to the investigation. (See id. at 1225-26). Specifically, the prosecutor questioned what contacting the IAB would have accomplished, and noted that Detective Tepperman, a "seasoned investigator of rape cases," investigated the case and that the petitioner was apprehended without anything "terrible" happening. (Id.) The prosecutor went on to state that the petitioner was "[p]atrolling for other victims, but he did not get far," and reiterated that the petitioner "did not get far" after the court overruled defendant's counsel's objection to the prosecutor's initial statement. (Id. at 1227). The State argues that the prosecutor's emphasis on the fact that the petitioner "did not get far" indicates that the initial statement was "plainly meant to focus the jurors[ ] on the detective's diligence rather than to inflame them," and was thus not improper. (Resp. Mem. at 46).[22] Indeed, when viewed in the context of the entire trial, and within the context of the summation itself, it seems that the prosecutor intended primarily to assuage any concerns that the investigation had been improperly or negligently conducted.

The prosecutor also used the term "patrolling" at an earlier point in her summation,

---

[22]Citations to "Resp. Mem." refer to the Respondent's Memorandum of Law in Opposition to Defendant's Petition for a Writ of Habeas Corpus, dated November 26, 2004.

noting that Ms. Justiniano identified the individual from the line-up who was "patrolling the area, who [was] patrolling around when he [was] stopped by Detective Tepperman." (Tr. at 1209-1210). She did not state that petitioner was patrolling for *victims*. Therefore, especially in light of trial testimony detailing a different implication of the term "patrolling,"[23] the statement does not seem to have implied that the petitioner was searching for additional victims when he was stopped by Detective Tepperman. Even if that was what the prosecutor intended to imply, the comment was certainly not so egregious as to have violated petitioner's due process rights.

With respect to the prosecutor's comments about the semen-covered t-shirt, it appears that these comments were also made in response to an argument put forth by petitioner's counsel. Specifically, petitioner's counsel argued that the t-shirt was exculpatory evidence because Ms. Justiniano's DNA was not found on it. (See Tr. at 1179). In response, the prosecutor argued that it was logical that none of Ms. Justiniano's DNA would be detected on the t-shirt, as Ms. Justiniano did not testify that the petitioner "wiped her with the [t-shirt]," but rather that petitioner, after ejaculating, walked to the front of the van with his pants down. (See id. at 1211-13). The prosecutor then suggested that the petitioner wiped himself off with something before pulling up his pants, concluding "[t]hat's why the semen is on the rag. And the fact that he even has this disgusting semen-covered rag really showed what was going on in that van." (Id. at 1213). The State contends that "the prosecutor's discussion of the [t]-shirt focused exclusively on its evidentiary value of proving defendant's guilt of sodomizing *Jennifer*," and could not have

---

[23]Detective Tepperman explained: "Patrolling is during the – to go out during the same hours that the crimes were committed and to patrol the areas where the crimes were committed and to be on the lookout for the vehicle and a possible person that fits the description." (Id. at 650).

been misunderstood to suggest that the t-shirt was evidence of other crimes. (Resp. Mem. at 44) (emphasis in original). Indeed, the prosecutor went on to argue that the recovery of the t-shirt from petitioner's van reinforced Ms. Justiniano's credibility. (Tr. at 1213-14). When taken in context, the Court finds that this argument was an attempt by the prosecutor to tie the witness's testimony to the physical evidence found at the scene and to argue that the presence of semen on the t-shirt confirmed the victim's testimony as to what was really "going on in that van." Contrary to petitioner's arguments, the prosecutor's comments never suggested to the jury that the t-shirt was evidence that petitioner had habitually assaulted girls in the van.[24]

Considering the context in which these statements were made, the Court is hard-pressed to find that the prosecutor's comments in summation – individually or cumulatively – prejudiced the petitioner's right to a fair trial.[25] Cf. Floyd v. Meachum, 907 F.2d 347, 353 (2d Cir. 1990) (holding that "under the totality of the circumstances . . . the *cumulative* effect of the prosecutor's persistent and clearly improper remarks amounted to such egregious misconduct as to render [the

---

[24]In his reply submission, petitioner appears to submit a new allegation that the prosecutor's summation was improper because the prosecutor repeatedly referred to the t-shirt recovered from petitioner's van as semen-stained, and thus misrepresented a "dramatic exhibit" because, as petitioner argues, "[m]aybe it had semen [on it] but it was not drench[ed]." (See Traverse and Reply to Prosecution's Affidavit and Memorandum of Law in Opposition to Petitioner's Writ of Habeas Corpus, dated March 1, 2005 ("Petr.'s Reply") ¶¶ 79, 81-83, 106, 107, 113, 114). This claim is plainly meritless.

[25]While petitioner's habeas submission indicates that the prosecutor also improperly appealed to the jury's sympathy in summation, petitioner provides no factual basis for his claim. (See Petr.'s Mem. at 3-5). In his brief to the Appellate Division, however, petitioner indicated that the prosecutor impermissibly appealed to the jury's sympathy when she stated that the petitioner "shoves his penis up against [Ms. Justiniano's] anus and steals her innocence" during the course of the incident. (Def.'s Br. at 23; Tr. at 1195). The trial court sustained petitioner's counsel's objection to the statement. (Tr. at 1195). Considering this claim with petitioner's other summation-related allegations does not change the Court's opinion that the petitioner's right to a fair trial was not prejudiced by the prosecutor's comments.

defendant's] trial fundamentally unfair") (emphasis added). Even if the prosecutor's comments during summation were found to be prejudicial, the trial court issued a number of general and specific instructions to the jury on the role of counsel's arguments. During the summation, the court gave the jury specific instructions when it sustained petitioner's counsel's objections to the prosecutor's statements regarding Ms. Justiniano's credibility. (Tr. at 1191-92, 1199, 1201-02, 1222). Not only did the trial court sustain the petitioner's objections in these instances, but the court also admonished the prosecutor not to vouch for the witness. (Id. at 1192, 1199, 1202). The court further instructed the jurors to disregard the prosecutor's comments and to base their verdict on the evidence. (Id. at 1192, 1199, 1202, 1222).

Moreover, during its closing charge to the jury, the trial court repeatedly charged the jurors as to what constituted evidence from which they could determine the facts and, both directly and indirectly, charged the jury that the attorneys' comments were not such evidence. (See Tr. at 1231-33, 1272). Additionally, the court clearly instructed the jury that they must determine both the credibility of each witness and the weight to afford each witness's testimony, and that the State was required to prove the identity of the perpetrator beyond a reasonable doubt. (Id. at 1232-34, 1242-46, 1248-49). Therefore, to the extent that there is any possibility that the prosecutor's remarks were prejudicial, the trial court's instructions were sufficiently curative. See United States v. Feliciano, 223 F.3d 102, 123-24 (2d Cir. 2000) (holding that the district court's "prompt responses and . . . final instructions" successfully mitigated any potential prejudice caused by the prosecutor's remarks, where the court's pre-summation and final charge indicated to the jury that "counsel's arguments are not evidence" and that it is the jurors' "'recollection and interpretation of the evidence that controls'"), cert. denied, 532 U.S. 943

(2001).

While the Appellate Division did not specifically address the petitioner's prosecutorial misconduct claims, it did note that "[t]he defendant's remaining contentions, including those raised in his supplemental pro se brief, are without merit." See People v. Velazquez, 299 A.D.2d at 500-01, 749 N.Y.S.2d at 740. The Appellate Division's conclusion that petitioner's remaining claims were "without merit," including those relating to alleged prosecutorial misconduct, qualifies as an "adjudication on the merits" for purposes of AEDPA deference. Sellan v. Kuhlman, 261 F.3d 303, 311-12 (2d Cir. 2001). Thus, petitioner can succeed on this portion of his habeas petition only if he can establish that the Appellate Division's decision was "contrary to" or an "unreasonable application of" Supreme Court precedent. 28 U.S.C. § 2254. Affording this deferential standard of review to the Appellate Division's decision on this prosecutorial misconduct claim, this Court finds no reason to disturb the Appellate Division's ruling. There is nothing to suggest that the state court's ruling either resulted in a decision that was contrary to clearly established federal law or that the state court unreasonably applied clearly established federal law. Id.


2) Testimony Concerning Victim's Emotional State

Like the claim concerning prosecutorial misconduct in the summation, petitioner's claim concerning the erroneous admission of testimony regarding the victim's emotional state was raised before the Appellate Division on direct appeal and in his application for leave to appeal

filed with the Court of Appeals. (See Def.'s Br. at 20-23, 27-28; Def.'s Appl. at 5).[26] However, this claim was not presented to the state court in terms of a federal constitutional violation.[27] Petitioner argued to the Appellate Division that the evidence of Ms. Justiniano's emotional state should not have been admitted because it was irrelevant and prejudicial. (Def.'s Br. at 21-23). The state cases that were cited in support of his argument did not employ a constitutional analysis in similar fact situations, nor did petitioner allege a "pattern of facts . . . well within the mainstream of constitutional litigation" or assert "the claim in terms so particular as to call to mind a specific right protected by the Constitution." Daye v. Attorney Gen. of State of New York, 696 F.2d at 194. Furthermore, petitioner did not rely on any relevant federal cases using constitutional analysis. Id.

Since petitioner failed to fairly alert the state court to the federal nature of this claim, he has failed to exhaust his state court remedies with respect to the claim. However, this federal claim is nonetheless deemed exhausted and procedurally defaulted because petitioner failed to

---

[26]Given petitioner's characterization of the testimonial claim as one of prosecutorial misconduct, the Court will consider petitioner's request for review of his claim that prosecutorial misconduct denied him due process, coupled with his citation to the portion of his brief that includes the testimonial claim, to be sufficient to have preserved the issue in his application to the Court of Appeals. As discussed herein, this claim is actually a challenge to an evidentiary ruling by the state court.

[27]Petitioner raised the claim to the Appellate Division as part of "Point I," which also included allegations of prosecutorial misconduct, and framed those allegations in constitutional terms. (Def.'s Br. at 20). However, the claim regarding the victim's emotional state was clearly argued to the Appellate Division in evidentiary, and not constitutional, terms. Thus, the claim was not fairly presented as a constitutional claim. See, e.g., Gordon v. Kelly, No. 89 CV 1907, 1989 WL 92043, at *2 (E.D.N.Y. Aug. 7, 1989) (holding that petitioner's claim that his due process rights had been violated by the trial court's admission of certain testimony was not fairly presented to the Appellate Division where petitioner cited the Constitution "once in a point heading in his brief and once in a string cite in the text" in his discussion of the claim).

raise this constitutional claim in his direct appeal. <u>See</u> <u>Aparicio v. Artuz</u>, 269 F.3d 78, 90-91 (2d Cir. 2001). He cannot now seek leave to appeal and raise the federal nature of this issue, because he has already made the one and only request for leave to appeal to which he is entitled under New York Court Rules. <u>See</u> N.Y. Comp. Codes R. & Regs. tit. 22, § 500.20 (detailing process for submitting application for leave to appeal in a criminal case); <u>People v Nesbitt</u>, 211 A.D.2d 490, 621 N.Y.S.2d 867 (1st Dep't 1995) (holding that the "[d]enial of the application for permission to appeal by the judge or justice first applied to is final and no new application may thereafter be made to any other judge or justice"). Collateral review by the state courts is also barred due to petitioner's failure to raise this federal constitutional claim on direct review. <u>See</u> N.Y. Crim. Proc. Law § 440.10(2)(c) (providing that where "sufficient facts appear on the record of the proceedings underlying the judgment" to have allowed adequate review of the claim on appeal, but where "no such appellate review or determination occurred" because the defendant failed to raise the issue on appeal, the trial court must deny a motion to vacate judgment).

Furthermore, the Court cannot review the procedurally defaulted claim because petitioner has neither asserted cause for his failure to raise the federal aspects of his evidentiary claim on direct appeal, nor set forth any prejudice. <u>See</u> <u>Murray v. Carrier</u>, 477 U.S. 478, 485 (1986). Petitioner has neither demonstrated that "'the factual or legal basis for [his] claim was not reasonably available to counsel, [n]or that "some interference by officials" made compliance impracticable.'" <u>Amadeo v. Zant</u>, 486 U.S. 214, 222 (1988) (internal citations omitted). Additionally, petitioner has not made a claim that ineffective assistance of counsel was the reason behind his failure to raise his federal constitutional claim. <u>See</u> <u>Murray v. Carrier</u>, 477

29

U.S. at 488.[28] Since petitioner failed to raise the claim on direct appeal, and cannot pursue the claim on appeal in the future due to the state's procedural bar, his claim that the testimony concerning the victim's emotional state was improperly admitted is considered exhausted but procedurally barred from review on the merits by this Court. See, e.g., Reyes v. Keane, 118 F.3d at 139-40 (holding that petitioner's habeas claim was deemed exhausted but was procedurally defaulted, and stating that "a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred") (internal quotation omitted).

Petitioner has also failed to demonstrate that a "fundamental miscarriage of justice" will occur if this Court fails to consider his evidentiary claim. Coleman v. Thompson, 501 U.S. at 750; see also Murray v. Carrier, 477 U.S. at 495-96. The Supreme Court has held that even where the petitioner is unable to show cause and prejudice, a federal court may review the petition under the "miscarriage of justice" exception if petitioner can credibly demonstrate "actual innocence" and show through "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence," Schlup v. Delo, 513 U.S. 298, 324 (1995), that the constitutional violation has "probably resulted in the conviction of one who is actually innocent." Murray v. Carrier, 477 U.S. at 496. Petitioner has not met this burden.

Even if the Court determined that the petitioner had appropriately exhausted his claim

---

[28]Even if petitioner were now to claim that trial counsel or appellate counsel were ineffective in this regard, those claims would not be cognizable in this habeas proceeding unless they had been first presented to the state court and exhausted in their own right. See Edwards v. Carpenter, 529 U.S. 446, 452-53 (2000).

concerning the admission of the testimony, petitioner's claim would fail on the merits. As previously indicated, petitioner alleges error in the admission of evidence regarding the victim's emotional state after the incident. Specifically, petitioner challenges the State's introduction of the testimony of three witnesses, Ms. Justiniano and the doctor and nurse who treated her in the hospital after the incident, who described Ms. Justiniano's demeanor and emotional state after the attack. (See Def.'s Br. at 21-22; Petr.'s Mem. at 3; Tr. at 384-86, 539-540, 1127).

When considering a claim that a state court's evidentiary ruling was in error, a federal court's habeas review is limited to determining whether the alleged error of the state court rises to the level of a constitutional violation. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). A petitioner who seeks habeas relief based on a claim that evidence was erroneously admitted "'bears a heavy burden[,] because evidentiary errors generally do not rise to constitutional magnitude.'" Moore v. Greiner, No. 02 CV 6122, 2005 WL 2665667, at *8 (S.D.N.Y. Oct. 19, 2005) (internal citation omitted); see also Tomlin v. Greene, No. 04 CV 232, 2004 WL 1234101, at *3 (E.D.N.Y. June 4, 2004) (noting that "[e]rroneous evidentiary rulings by a state trial court generally do not rise to the level of constitutional violations upon which a federal court may issue a writ of habeas corpus"); Roberts v. Scully, 875 F. Supp. 182, 189 (S.D.N.Y.), aff'd, 71 F.3d 406 (2d Cir. 1995). In order to prevail, a petitioner must demonstrate that the state court's evidentiary error "'deprived [him] of a *fundamentally fair* trial.'" Zarvela v. Artuz, 364 F.3d 415, 418 (2d Cir. 2004) (per curiam) (internal citations omitted), cert. denied, 543 U.S. 879 (2004). The question is whether, when "viewed objectively in light of the entire record before the jury," the erroneously admitted evidence was "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it."

Collins v. Scully, 755 F.2d 16, 18-19 (2d Cir. 1985); accord Lopez v. Fischer, No. 05 CV 2558, 2006 WL 2996548, at *10 (S.D.N.Y. Oct. 16, 2006).

Petitioner argues that the testimony concerning Ms. Justiniano's emotional state was inadmissible because it was irrelevant and prejudicial. (Petr.'s Mem. at 3-4; Def.'s Br. at 21-23). In response, the State argues not only that petitioner failed to present this claim to the state court in terms of a constitutional violation and that the claim is therefore barred from habeas review (see discussion supra at 27-28), but also that to the extent that there may have been evidentiary error, a premise the State does not concede, petitioner has certainly not shown that the admission of this evidence was an error "'so pervasive as to have denied him a fundamentally fair trial.'" (See Resp. Mem. at 55-58 (citing Collins v. Scully, 755 F.2d at 18)). Indeed, the State argues there was no error and that the evidence of the victim's emotional state was properly admitted as probative of the fact that petitioner used forcible compulsion in committing the crimes of sodomy, rape, and sexual abuse. (Id. at 57). The State further contends that the evidence established that the victim promptly reported the assault, which was relevant to the victim's credibility, and the evidence was also relevant because it contributed to the "orderly presentation and plausibility of the prosecution's case generally." (Id.)

This Court agrees that to the extent this testimony may have been admitted in error – a finding this Court need not make under these circumstances – it was an error of state evidentiary law that did not rise to the level of a constitutional deprivation of due process. See Collins v. Scully, 755 F.2d at 18-19. Viewed in conjunction with all of the evidence demonstrating petitioner's guilt, evidence of the victim's demeanor following the incident was clearly not so prejudicial as to deprive petitioner of a fundamentally fair trial, and thus the admission of such

evidence did not violate the petitioner's due process rights.

### 3) Impermissibly Suggestive Line-up and Photo Array

Petitioner's third claim relates to the impermissibly suggestive nature of the line-up and

photo array. (Petr.'s Mem. at 5-11). This claim was raised on direct appeal to the Appellate

Division and in petitioner's leave application to the Court of Appeals, and is thus exhausted.

(Def.'s Br. at 28-33; Def.'s Appl. at 2). In its decision, the Appellate Division indicated that

"[t]he hearing court properly denied that branch of the defendant's motion which was to suppress

identification testimony." People v. Velazquez, 299 A.D.2d at 500, 749 N.Y.S.2d at 740.

Therefore, bearing in mind the deferential standard of review imposed by AEDPA, the Court

may consider the merits of petitioner's claims.[29]

---

[29]The State contends that petitioner's suggestive identification claims are barred from habeas review because the post-judgment motion court's "decision rejecting them rested on an independent and adequate state-law procedural ground." (Resp. Mem. at 85-87). Specifically, the court that heard petitioner's Section 440.10 claims found that the claims relating to the photo array and identification process had been ruled on by the Appellate Division on direct appeal and, as a consequence, were barred from collateral review on a Section 440.10 motion. (See Decision dated Dec. 3, 2002 at 2). Section 440.10(2)(a) of New York's Criminal Procedural Law provides that a court must deny a motion to vacate judgment when the "ground or issue raised upon the motion was previously determined on the merits upon an appeal from the judgment, unless since the time of such appellate determination there has been a retroactively effective change in the law controlling such issue." N.Y. Crim. Proc. Law § 440.10(2)(a).

Although the post-judgment motion court found that petitioner's claim regarding the impermissibly suggestive identification procedures was procedurally barred from review pursuant to N.Y. Crim. Proc. Law § 440.10(2)(a), the Second Circuit has held that a habeas court may assess the merits of claims denied by a post-judgment motion court pursuant to that provision. See Silverstein v. Henderson, 706 F.2d 361, 368 (2d Cir.) (indicating that a denial of relief on the basis of N.Y. Crim. Proc. Law § 440.10(2)(a) "does not constitute a finding of procedural default that would bar federal consideration of [the petitioner's] claims"), cert. denied, 464 U.S. 864 (1983); Guzman v. Couture, No. 99 CV 11316, 2003 WL 165746, at *11 (S.D.N.Y. Jan. 22, 2003) (holding that "since the trial court expressly relied on CPL § 440.10(2)(a) to deny petitioner's application, it cannot be said that the court relied on a procedural bar, and this court

Petitioner alleges that the line-up was suggestive and tainted by the suggestive photo array shown to the witnesses the day before the line-up was conducted. (Petr.'s Mem. at 5-6). As to the photo array, petitioner, who is Hispanic, contends that the array was suggestive because although the victims described the assailant as Hispanic, three of the photographs in the array were of men who were allegedly not Hispanic, and only two of the men in the array matched the assailant's description. (Id. at 6-7). With respect to the line-up, petitioner complains that one of the fillers did not look Hispanic, and that the petitioner was wearing white pants while all of the other men were wearing dark pants. (Id. at 7). He also complains that the men were of varying heights and weights. (Id.) Given that the question of the identity of the perpetrator was the critical issue at trial, petitioner argues that the line-up identification should have been suppressed and a new trial ordered. (Id. at 5-9).

In response, the State argues that not only were the identification procedures not suggestive "in the least," but also that the petitioner has failed to demonstrate that the Appellate Division's decision denying this claim on appeal was "contrary to," or "an unreasonable application of," established Supreme Court law. (Resp. Mem. at 58-76).

    (a)  <u>Legal Standards</u>

It is well-established that identification testimony is subject to suppression only when the identification procedures are "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to constitute a violation of due process. <u>Stovall v. Denno</u>, 388 U.S. 293, 301-02 (1967) (abrogated on other grounds); <u>see also</u> <u>Simmons v. United States</u>, 390 U.S. 377, 384

---

is not precluded from turning to the merits of [the] claims").

(1968) (holding that a conviction based on an in-court identification following an out-of-court identification by photograph will be set aside on that basis only where there is a showing that the "identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification"). The claim is one that should be evaluated in light of the totality of the circumstances, see Stovall v. Denno, 388 U.S. at 302, and in each case, the court must initially make a determination based on the facts of the particular case as to whether the pre-trial identification procedure was "unnecessarily suggestive or prejudicial." United States v. Richardson, 837 F. Supp. 570, 573 (S.D.N.Y. 1993) (citing Simmons v. United States, 390 U.S. at 384).

Thus, where there has been a pre-trial identification, the courts employ a two-step inquiry to determine whether identification testimony will be admitted. The first step requires a determination of whether the identification procedures were unduly suggestive. See United States v. Maldonado-Rivera, 922 F.2d 934, 973 (2d Cir. 1990), cert. denied, 501 U.S. 1211 (1991); Jones v. Ricks, No. 02 CV 2719, 2004 WL 212908, at *4 (E.D.N.Y. Jan. 28, 2004). If a determination is made that the pre-trial identification procedure was not unduly suggestive, then there is no need to proceed to the second step of the analysis; the identification will be admitted and any concerns relating to the reliability of the identification go only to the weight of the identification testimony and not to its admissibility. See United States v. Thai, 29 F.3d 785, 808 (2d Cir.), cert. denied, 513 U.S. 977 (1994); United States v. Maldonado-Rivera, 922 F.2d at 973. However, if the court determines that the identification procedure employed was impermissibly suggestive, then the court must weigh the suggestiveness of the procedure with factors suggesting that an in-court identification is independently reliable. The testimony may be admissible if the

court finds the in-court identification to be "independently reliable rather than the product of the earlier suggestive procedures." United States v. Maldonado-Rivera, 922 F.2d at 973; see also United States v. Ciak, 102 F.3d 38, 42 (2d Cir. 1996); United States v. Thai, 29 F.3d at 808.

In determining whether a photo array is impermissibly suggestive, the courts look to a number of factors, including the number of individuals displayed in the photo array, and "whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to 'suggest to an identifying witness that [that person] was more likely to be the culprit.'" Jarrett v. Headley, 802 F.2d 34, 41 (2d Cir. 1986) (quoting United States v. Archibald, 734 F.2d 938, 940 (2d Cir.), modified by, 756 F.2d 223 (2d Cir. 1984)); see also United States v. Wong, 40 F.3d 1347, 1359-60 (2d Cir. 1994) (applying the same analysis to evaluate the suggestiveness of a line-up), cert. denied, 516 U.S. 870 (1995). Thus, while the photographs need not be uniform, an array "must not be so limited that the defendant is the only one to match the witness's description of the perpetrator." United States v. Maldonado-Rivera, 922 F.2d at 974. Courts have found the pretrial identification procedures to be impermissibly suggestive, for example, where the defendant in a photo array was the only individual with the skin color and haircut described by the witness. See, e.g., United States v. Fernandez, 456 F.2d 638, 641-43 (2d Cir. 1972). Moreover, courts have generally held that a photo array containing six or more photographs is sufficiently large so as to not be unduly suggestive. See, e.g., United States v. Thai, 29 F.3d at 808 (gathering cases).

Even where the photo array itself may not be suggestive, the actions or remarks of the officers and the manner in which they present the array may render an otherwise fair array impermissibly suggestive. See United States v. Thai, 29 F.3d at 808, 810 (internal citations

omitted). In examining the procedures used by law enforcement officials, courts consider both the officer's comments in presenting the array and the manner of presentation, United States v. Maldonado-Rivera, 922 F.2d at 974, including whether the witness's initial identification was certain or tentative, whether there were repeated showings of a selected photograph in isolation, whether the officer reinforced an initially tentative identification by conducting a show-up or by pressuring the witness to take additional looks at the suspect, see Jarrett v. Headley, 802 F.2d at 41-42, and whether the officer made suggestive comments prior to the identification. See United States v. Thai, 29 F.3d at 808. However, comments including "we can't just take a 'possibly,'" made by a police officer to an identifying witness before she examined the second of two versions of the same line-up, see United States v. Wong, 40 F.3d at 1358-59, and "'stick to your guns,'" made by a prosecutor to an identifying witness before trial, see Jarrett v. Headley, 802 F.2d at 45-46, have been found not to be impermissibly suggestive.

"A lineup is unduly suggestive as to a given defendant if he meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not." Abdur Raheem v. Kelly, 257 F.3d 122, 134 (2d Cir. 2001), cert. denied, 534 U.S. 1118 (2002); see also United States v. Wong, 40 F.3d at 1359-60. It is well-settled that there is no requirement that all line-up participants be identical in appearance. Roldan v. Artuz, 78 F. Supp. 2d 260, 271 (S.D.N.Y. 1999) (gathering cases). Moreover, the "focus of the inquiry is not whether the suspect has a distinctive feature not shared by the other participants, but whether that feature matches the description provided by the witness." West v. Greiner, No. 01 CV 1267, 2004 WL 315247, at *4-6 (E.D.N.Y. Feb. 24, 2004) (internal citations omitted) (finding line-up in which petitioner was the only participant with gray hair to be permissible, where the witnesses'

descriptions of the suspect did not include hair color and at least two of the fillers matched the description given by the witnesses).

Where the pretrial identification procedures are deemed impermissibly suggestive, a later in-court identification may be considered tainted and a violation of due process unless the court determines that the in-court identification is independently reliable. See Jarrett v. Headley, 802 F.2d at 42; Kendrick v. Greiner, 296 F. Supp. 2d 348, 364 (E.D.N.Y. 2003). Suppression of a witness's identification will not be required if it can be shown that the impermissibly suggestive procedure did not influence the witness's identification, as in instances in which the "'witness's identification was already positive.'" See United States v. Wong, 40 F.3d at 1362 (quoting Jarrett v. Headley, 802 F.2d at 41-42).

### (b)  Application - Photo Array

Based on the testimony of Detective Brian Kenzik, who showed the photo arrays to both of the victims, the Queens County Supreme Court denied petitioner's motion to suppress, finding that the photo array identification procedures were not suggestive. (See Def.'s Br. at 4-7 (citing Memorandum dated February 16, 1999, Court File)).

During the Wade hearing, see United States v. Wade, 388 U.S. 218 (1967), Detective Kenzik testified that the two witnesses were actually each shown two photo arrays consisting of six photographs each, for a total of 12 photographs. (Wade Tr. at 4-8, 15, 20, 23).[30]  The

---

[30]Citations to "Wade Tr." refer to the transcript prepared from the Wade hearing held before the Supreme Court, Queens County on January 6, 1999. It appears that the Queens County Supreme Court issued a written decision following the Wade hearing, as the petitioner repeatedly quoted the decision in his brief to the Appellate Division. (See Def.'s Br. at 6-7). Neither party submitted the written decision to this Court for review in connection with the

petitioner's photograph only appeared in one of the photo arrays. (Id. at 9-11). Detective Kenzik further testified that he believed all of the other photographs depicted individuals who, like petitioner, were police officers. (Id. at 11, 25). However, petitioner's counsel argued at the close of the hearing that three of the men in the arrays were not Hispanic. (Wade Tr. at 56-57; Def.'s Br. at 6).[31] Nevertheless, as indicated by petitioner's appellate counsel, the hearing "court found that the 'individuals depicted were sufficiently similar to [petitioner] in general physical appearance . . . to negate any likelihood of misidentification.'" (Def.'s Br. at 6-7). The hearing court's factual finding is presumed to be correct for purposes of habeas review. See 28 U.S.C. § 2254(e)(1); Carroll v. Greene, No. 04 CV 4342, 2006 WL 2338119, at *11 (S.D.N.Y. Aug. 11, 2006) (noting that a trial court's factual finding that "one of the fillers 'was not much lighter than [petitioner] in skin color' and, '[i]n any event, it doesn't appear to me that this line up is unduly suggestive'" was presumptively correct for habeas purposes). Petitioner has not presented clear and convincing evidence that the state court's factual determination was erroneous.[32]

---

habeas petition.

[31]It is unclear from the Wade hearing transcript whether petitioner's counsel was contending that three individuals from the array in which the petitioner appeared did not appear to be Hispanic, or whether he was contending that three of the twelve individuals depicted across both arrays did not appear to be Hispanic. (See Wade Tr. at 56-57). Petitioner now contends that three photographs in the array in which he appeared were of non-Hispanic men and that the other array consisted entirely of Indian men. (Petr.'s Reply ¶¶ 149, 160). Meanwhile, Ms. Justiniano testified at trial that the first array contained no Hispanic men and that she "really [didn't] know" whether the individuals depicted in the array with the petitioner were Hispanic. (Tr. at 615-17).

[32]Contrary to petitioner's suggestion, the Court will not infer suggestiveness based on the fact that one of the photo arrays has been misplaced. See Ranta v. Bennett, No. 97 CV 2169, 2000 WL 1100082, at *39 (E.D.N.Y. May 23, 2000) (noting that "the mere fact that line-up identification photographs were inadvertently lost after trial does not require that a presumption of suggestiveness be applied," and indicating that the "appropriate focus" is whether the loss of the exhibit was a "result of bad faith") (internal citations and quotation marks omitted), aff'd,

Moreover, even if three of the six individuals depicted in petitioner's photo array did not, as petitioner's counsel contends, appear to be Hispanic, the Appellate Division's determination that the hearing court properly denied petitioner's motion to suppress was neither contrary to, nor an unreasonable application of, clearly established federal law. See United States v. Maldonado-Rivera, 922 F.2d at 974 (indicating that all of the photographs need not be perfectly uniform, and reiterating its previous position that a photo array containing 11 photographs, only two of which matched the perpetrator's description, would not be impermissibly suggestive) (citing United States v. Fernandez, 456 F.2d at 641-42). Given that arrays consisting of only six photographs have been found to be appropriate, see United States v. Thai, 29 F.3d at 808 (gathering cases finding that an array of six or more photos is not unduly suggestive), the arrays in this case comport with the standards imposed by clearly established federal law even if some of the individuals did not appear to be Hispanic.

Furthermore, petitioner has failed to articulate any basis for finding that the procedures used in presenting the arrays were improper. There is no evidence to suggest that Detective Kenzik made any statements to the witnesses while presenting the arrays that would suggest to the witnesses which photograph to select. The two witnesses viewed the arrays separately, and there is no evidence to suggest that the detective pressured either witness to make an identification. Nor is there evidence of repeated showings of the photographs designed to influence the witnesses' identifications. Thus, petitioner has failed to present any evidence that merits habeas relief.

---

189 Fed. Appx. 54 (2d Cir. 2006). The Court further notes that petitioner submitted photocopies of both photo arrays with his reply memorandum. (Petr.'s Reply, Ex. at 13-14).

Where, as here, the petitioner fails to establish the impermissibly suggestive nature of the pretrial identification procedures, no further judicial inquiry into the independent reliability of the witness's identification is required. See United States v. Maldonado-Rivera, 922 F.2d at 973; Jarrett v. Headley, 802 F.2d at 42 (noting that "if the procedures were not impermissibly suggestive, independent reliability is not a constitutionally required condition of admissibility") (internal citations omitted). The question as to the reliability of the identification under these circumstances becomes an issue for the jury. Jarrett v. Headley, 802 F.2d at 42 (citing Foster v. California, 34 U.S. 440, 442 n.2 (1969)). Nonetheless, the Court notes that there are factors that substantiate the independent reliability of both witnesses' identifications. See Neil v. Biggers, 409 U.S. 188, 199-200 (1972) (holding that where pretrial identification procedures are unduly suggestive, the court must determine whether the identification was reliable under the "'totality of the circumstances'" by considering the witness's opportunity to view the perpetrator at the time of the crime, her degree of attention to the perpetrator, the accuracy of her prior description, the level of certainty at the time of the identification, and the length of time between the crime and the witness's identification); United States v. Archibald, 734 F.2d at 940-41.

In this instance, the witnesses' statements and behavior at the time of the out-of-court identifications provide independent indicia as to the reliability of those identifications. While Ms. Justiniano scrutinized the first array for a minute before telling the detective that she did not recognize anyone (Wade Tr. at 20), her recognition of petitioner in the second array was almost immediate. Upon being shown the second array, "her hands went up to her chest" and she told the detective, "'My heart is pounding. It's number two.'" (Id. at 8, 20). Ms. Hussein also scrutinized the first photo array for 30-40 seconds before concluding that she did not recognize

41

anyone. (Id. at 4-5, 15-16). However, when she saw the second array, she "almost immediately" selected petitioner's photograph as the man who tried to force her into his van at gunpoint. (Id. at 4-5, 16).

Moreover, Ms. Hussein gave a detailed description of the perpetrator, describing him as a Hispanic male in his mid-thirties with wavy hair, a possible mustache, and a silver gun. (Tr. at 981-82; Wade Tr. at 17). She characterized her level of certainty as to the identification of the petitioner's photograph as a "ten" on a scale of one to ten. (Wade Tr. at 16-17). Ms. Justiniano's assessment of certainty as to her photographic identification was seven out of ten (id. at 21), but the evidence suggests that her identification is nonetheless equally reliable. She had numerous opportunities to observe petitioner in the van during the assault, and her testimony demonstrated that she was aware of what was going on at the time and that she focused on her surroundings. (Tr. at 513-17, 523-36). Like Ms. Hussein, Ms. Justiniano gave a detailed description of petitioner. (Id. at 541-43).

Based on these factors, this Court can find no basis on which to conclude that the Appellate Division rendered a decision that was contrary to, or an unreasonable application of, clearly established federal law when it rejected petitioner's appeal of the hearing court's decision concerning the suggestive nature of the photo array.

### (c) Application - Line-up

As with the photo array, the evidence regarding the composition of the line-up and the procedures used in conducting the line-up do not support petitioner's claim that habeas relief is

warranted because the line-up was impermissibly suggestive.[33] Sergeant Ralph Garcia, who conducted the line-ups at the 112th Precinct on January 9, 1998, testified that on that date, both Ms. Justiniano and Ms. Hussein were brought to the precinct to participate in the petitioner's line-up, although they were kept in separate rooms and shown the line-up independently. (Wade Tr. at 26-28, 30-32). Both petitioner's counsel and an ADA were present during the line-up. (Id. at 28).

The line-up consisted of six men: petitioner and five "fillers" assembled from a nearby men's shelter who were chosen based on their resemblance to petitioner. (See id. at 28-29, 33-34). One of the fillers originally chosen by Sergeant Garcia was semi-bald and was replaced with another filler when the State raised an objection. (Id. at 29). While petitioner's counsel objected to one of the fillers on the grounds that he did not "look Hispanic," that filler does not appear to have been replaced. (See id. at 28-29). The six men were seated during the line-up. (Id. at 53). Petitioner, who chose to be seated in position number five, was selected by Ms. Justiniano as the man who had sexually assaulted her. (Id. at 29-30). Ms. Hussein was separately asked to view the line-up and also identified the person occupying position number five – the petitioner – as the individual who tried to abduct her on December 31, 1997. (Id. at 32, 48). On both occasions, Sergeant Garcia asked the witnesses only if they recognized anyone. (Id. at 30, 32, 41-43, 48). When they responded in the affirmative, he then asked which position in the line-up the

_____

[33]Given that the photo array was not impermissibly suggestive, the Court need not address petitioner's claim that the line-up was "tainted by the witnesses['] observation the day before of a suggestive photo array." (Petr.'s Mem. at 5). Notably, the fact that "an individual is common to both a photo array and a line-up does not, without further indicia of suggestiveness, render the line-up conducive to irreparable misidentification." Mercer v. Keane, No. 95 CV 1538, 1997 WL 529031, at *4 (S.D.N.Y. Aug. 25, 1997) (internal citations omitted).

individual occupied and from where they recognized the individual. (Id.)

The evidence demonstrates that there was nothing suggestive about the procedure used to conduct the line-up: neither of the witnesses saw the petitioner before the line-up; the witnesses had no contact with each other either before, during, or after the process; and there is no evidence indicating that the sergeant conducting the line-up made any remarks suggesting which individual the witnesses should select. Nor is there any evidence that Sergeant Garcia made any statements regarding the witnesses' selections.

In challenging the composition of the line-up, petitioner argues that one of the fillers did not "look Hispanic," that petitioner was the only one wearing white pants, and that the fillers were of different heights and weights. (Petr.'s Mem. at 7). The State contends that any differences in height were compensated for by having the men seated during the line-up, and that any differences in weight or apparel were minimized by the placards the participants held in front of themselves. (Resp. Mem. at 71-72). The State further contends that petitioner's counsel's presence at the line-up and his objection to only one of the fillers suggests that the line-up was not unduly suggestive. (Id. at 73).

After reviewing the line-up photographs, the hearing court found that the "photographs revealed that '[t]he fillers were of defendant's approximate age with similar facial and physical characteristics' with 'no noticeable racial or ethnic disparities among the participants.'" (Def.'s Br. at 7). Petitioner has not presented clear and convincing evidence that the hearing court erred in its factual finding concerning the composition of the line-up.

Even if petitioner's characterization of the appearances of the line-up participants is accurate, the Appellate Division's denial of petitioner's appeal was neither contrary to, nor an

44

unreasonable application of, clearly established federal law. Complainants' descriptions did not indicate that the suspect was wearing white pants,[34] see West v. Greiner, 2004 WL 315247, at *4-6, and any variations in heights and weights were minimized due to the fact that the line-up participants were seated.[35] Thus, it was not objectively unreasonable for the Appellate Division to conclude that the hearing court properly denied petitioner's motion to suppress. See Abdur Raheem v. Kelly, 257 F.3d at 134 (noting that a line-up is impermissibly suggestive where the petitioner is the only participant who meets the description of the perpetrator). Moreover, even if the composition of the line-up could be deemed unduly suggestive, there is an independent basis for concluding that the identifications during the line-up were reliable given that both witnesses had ample opportunity to view the petitioner during the incidents.[36]

### 4) Loss of Photo Array and Original Line-up Photograph

In addition to arguing that the identification procedures were suggestive, petitioner argues that he was deprived of his due process right to appellate review by the loss of one of the photo

---

[34]In fact, Ms. Justiniano indicated that the perpetrator was wearing "light blue jeans." (Tr. at 542).

[35]Moreover, the Court was unable to find any instance in which either of the victims had supplied the police with a definitive assessment of the perpetrator's weight.

[36]In its Memorandum of Law, the State argues that even if the Appellate Division had erred, the admission of the line-up identification was harmless error, as petitioner has failed to demonstrate "actual prejudice" in light of the cumulative weight of all of the other evidence. (See Resp. Mem. at 74-75 (quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)). The Court need not address this argument because it finds that the admission of the line-up evidence was not erroneous.

arrays and the loss of the original line-up photograph.[37] Petitioner asserts that two decisions

issued by the Court of Appeals after his conviction make it clear that the loss of the photo array

and the original line-up photograph constitute a denial of due process. (See Petr.'s Mem. at 9-10

(citing People v. Jackson, 98 N.Y.2d 555, 780 N.E.2d 162, 750 N.Y.S.2d 561 (2002); People v.

Yavru-Sakuk, 98 N.Y.2d 56, 772 N.E.2d 1145, 745 N.Y.S.2d 787 (2002)).[38] Petitioner's

allegation that he was deprived of his right to appeal was appropriately exhausted. (See Def.'s

Br. at 32-33; Def.'s Appl. at 1-5).[39] After finding that the hearing court did not err in denying

petitioner's motion to suppress, the Appellate Division further indicated that the loss of one of

the photo arrays and the poor quality of the line-up photograph furnished to petitioner did "not

give rise to the inference that the photographic array and lineup were suggestive, since the

hearing court had the opportunity to view the original photographs and determined that they were

not unduly suggestive." People v. Velazquez, 299 A.D.2d at 500-01, 749 N.Y.S.2d at 740

(internal citations omitted).

It is well-established that there is no federal constitutional right to appeal from a state

---

[37]While a photocopy of the line-up photograph was preserved, petitioner indicated in his brief to the Appellate Division that it "is so dark and of such poor quality that the face of filler number six cannot be seen at all and those of the others are virtually indiscernible." (Def.'s Br. at 31).

[38]The two cases cited by the petitioner detail the analytical framework employed by an appellate court to determine where a defendant was deprived of meaningful appellate review by the loss of a trial exhibit. See People v. Jackson, 98 N.Y.2d at 560, 780 N.E.2d at 166, 750 N.Y.S.2d at 565; People v. Yavru-Sakuk, 98 N.Y.2d at 59-60, 772 N.E.2d 1147-49, 745 N.Y.S.2d 789-91).

[39]Petitioner also raised this issue in a motion for reargument of the Appellate Division's November 18, 2002 decision affirming petitioner's conviction. (See Affirmation of Erica Horwitz, Esq., dated December 13, 2002 and submitted in support of petitioner's motion for reargument).

conviction. Ross v. Moffitt, 417 U.S. 600, 606, 611 (1974). "[W]hether an appeal should be allowed, and if so, under what circumstances or on what conditions, are matters for each State to determine for itself." McKane v. Durston, 153 U.S. 684, 688 (1894); see also Smith v. Robbins, 528 U.S. 259, 271 n.5 (2000). In certain circumstances, however, a habeas petitioner may state a cognizable constitutional claim arising from the prosecution's failure to preserve evidence for appellate review. See Carroll v. Greene, 2006 WL 2338119, at *14-15 (using a due process analysis to assess a habeas petitioner's claim that "he was deprived of his fundamental right to an appeal" when his line-up photograph was lost after trial). However, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Arizona v. Youngblood, 488 U.S. 51, 58 (1988); see also Carroll v. Greene, 2006 WL 2338119, at *14-15 (holding that the post-trial loss of petitioner's line-up photograph did not violate petitioner's constitutional rights where "[p]etitioner ha[d] not even alleged, much less presented any evidence, that the loss of the line-up photograph . . . was the result of bad faith on the part of the District Attorney's office" and the petitioner had not presented "any evidence that the missing photograph would support his contention that the lineup was unduly suggestive").

Here, petitioner has not even alleged, much less presented any evidence, that the loss or destruction of the photographs was purposeful or that the photographs would be materially exculpatory in light of the Court's assessment of the independent reliability of the identification procedures. Therefore, petitioner's claim arising from the lost photographs does not merit habeas relief as the Appellate Division's decision was neither contrary to, nor an unreasonable application of, clearly established federal law.

47

5) Indictment Deficiencies

Petitioner's fifth claim involves the alleged inadequacy of his indictment. (Petr.'s Mem. at 11-12). Specifically, he argues that he was "denied due process and other constitutional protections" because the indictment failed to satisfy certain state statutory requirements, did not provide sufficient notice of the charges against him because it did not detail "how forcible compulsion is implied," and was based solely on uncorroborated testimony of the complainants. (Id.) Moreover, he claims that in reviewing his appeal, the Appellate Division neglected to render a "more elaborate decision" concerning these points.[40] (Id.) Most of the issues concerning the inadequacy of the indictment were raised in constitutional terms in petitioner's pro se supplemental brief to the Appellate Division and in petitioner's application for leave to appeal to the Court of Appeals, and are therefore exhausted. (See Def.'s Pro Se Br. at 5-12;[41] Def.'s Appl. at 5). Since those claims that petitioner may not have fairly presented to the state courts in constitutional terms would not present issues cognizable on habeas review even if appropriately exhausted, the Court will nevertheless address them below.[42] As previously noted, the Appellate Division held that the contentions raised in petitioner's supplemental pro se brief were without merit. People v. Velazquez, 299 A.D.2d at 501, 749 N.Y.S.2d at 740.

---

[40]The Court notes that it is under an obligation to liberally construe petitioner's pro se submissions. See Haines v. Kerner, 404 U.S. 519, 520-21 (1972).

[41]Citations to "Def.'s Pro Se Br." refer to the Petitioner's Pro Se Brief to the Appellate Division, dated May 21, 2002.

[42]The claim concerning the thoroughness with which the Appellate Division conducted its review of petitioner's indictment claims appears to be raised for the first time in the petition currently pending before this Court. This unexhausted claim will be addressed in the Court's discussion of a variety of petitioner's other unexhausted claims, infra at 71-74.

Although there is no federal constitutional right to a grand jury in a state criminal proceeding, the state's implementation of its grand jury process may not violate the federal Constitution. See Mirrer v. Smyley, 703 F. Supp. 10, 11-12 (S.D.N.Y.), aff'd, 876 F.2d 890 (2d Cir.), cert. denied, 493 U.S. 850 (1989). Thus, insofar as petitioner is alleging a violation of due process based on the insufficiency of the charges contained in the indictment, an indictment has been held to pass constitutional muster if it "'charges a crime 1) with sufficient precision to inform the defendant of the charges he must meet and 2) with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events.'" De Vonish v. Keane, 19 F.3d 107, 108 (2d Cir. 1994) (quoting United States v. Stavroulakis, 952 F.2d 686, 693 (2d Cir. 1992)), cert. denied, 513 U.S. 841 (1994); see also Carroll v. Hoke, 695 F. Supp. 1435, 1438 (E.D.N.Y. 1988) (holding that basic constitutional standards require that an indictment inform the accused "in general terms, of the time, place and essential elements of the alleged crime") (internal citations omitted), aff'd, 880 F.2d 1318 (2d Cir. 1989). Here, the indictment notified petitioner of the time and place of each of the crimes alleged, and the language of the charges tracked the statutory language of the crimes, including the element of forcible compulsion. (See Queens County Indictment 3175/98). Accordingly, the Appellate Division's determination that petitioner's due process claim concerning the adequacy of petitioner's indictment was neither contrary to, nor an unreasonable application of, clearly established federal law.

To the extent that petitioner challenges the sufficiency of the indictment under N.Y. Crim. Proc. Law § 200.50[43] (see Petr.'s Br. at 11-12), his claim was denied by the Appellate Division in its blanket assertion that all claims raised in the petitioner's pro se supplemental

---

[43]This state procedural provision governs the form and content of indictments.

submission were without merit. People v. Velazquez, 299 A.D.2d at 501, 749 N.Y.S.2d at 740. Since this claim is clearly based on state procedural law, it is not cognizable on federal habeas review. See Estelle v. McGuire, 502 U.S. at 67-68 (emphasizing that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); United States ex rel. Mintzer v. Dros, 403 F.2d 42, 43 (2d Cir. 1967) (per curiam), cert. denied, 390 U.S. 1044 (1968); Cortez v. Scully, 717 F. Supp. 224, 227 (S.D.N.Y. 1989).

In general, claims of deficiencies or improprieties in state grand jury proceedings related to the charging decision are foreclosed from federal habeas review "where a properly instructed petit jury heard all relevant evidence and convicted," because the petit jury's verdict renders harmless any grand jury errors. See Lopez v. Riley, 865 F.2d 30, 32-33 (2d Cir. 1989) (noting that "[i]f federal grand jury rights are not cognizable on direct appeal where rendered harmless by a petit jury, similar claims concerning a state grand jury proceeding are *a fortiori* foreclosed in a collateral attack brought in a federal court"); accord Figueroa v. Donnelly, No. 02 CV 6259, 2003 WL 21146651, at *8 (S.D.N.Y. May 16, 2003) (indicating that "it has been consistently held that claims of error in a state grand jury proceeding are not cognizable for federal habeas corpus review after a petit jury has convicted the petitioner"). Thus, petitioner's claim that he was denied due process because the indictment was based solely on the complainants' uncorroborated testimony cannot serve as a basis for habeas relief.[44] See Roberts v. Scully, 875 F. Supp. at 193

---

[44]In People v. Pelchat, 62 N.Y.2d 97, 464 N.E.2d 447, 476 N.Y.S.2d 79 (1994), the New York Court of Appeals examined the New York State Constitution's requirement of indictment by grand jury, and concluded that indictments "are rarely open to attack on grounds of inadequacy after a conviction" unless "there was a total lack of evidence before the Grand Jury," "the quality of the evidence is challenged because the witness's testimony was perjured," or "the indictment is founded on hearsay testimony which the Grand Jury may not have understood as such." People v. Pelchat, 62 N.Y.2d at 104-106, 464 N.E.2d at 451-52, 476 N.Y.S.2d at 83-84

(finding that "petitioner's claim of insufficient evidence before the grand jury is not cognizable on habeas review since the indicted charges were heard at a plenary trial by a petit jury, which returned an unassailable guilty verdict").

### 6) Prosecutorial Misconduct: Grand Jury

Petitioner further alleges that the prosecutor withheld exculpatory evidence and elicited perjurious testimony during the grand jury process, in violation of his due process rights. (Id. at 12-19). Petitioner briefly raised these allegations to the Appellate Division, arguing that the prosecutor did not present certain exculpatory evidence to the grand jury and thereby impaired the "integrity" of the grand jury proceedings. (Def.'s Pro Se Br. at 7, 9, 12). The issue was raised in similar terms in petitioner's leave application to the Court of Appeals. (Def.'s Appl. at 5). Since petitioner's brief to the trial court expanded upon these allegations and explicitly framed them in a due process context (Def.'s 440.10 Br. at 5-24), and the post-judgment motion court found that the claims were procedurally barred because they had already been raised on direct appeal (see Decision of Dec. 3, 2002 at 2), the Court will treat the claims as having been appropriately exhausted.[45]

Nonetheless, petitioner's claims concerning alleged prosecutorial misconduct in the grand jury process do not merit habeas relief. It is well-settled that federal law does not require a

---

(internal citations omitted). Thus, even state law does not appear to support petitioner's contention given the amount of evidence presented to the grand jury.

[45]Given that the post-judgment motion court indicated that it was procedurally barred from reviewing petitioner's claims concerning the State's conduct in the grand jury process because the claims were raised on direct appeal and were denied (see id.), this Court may review the claims on the merits. (See discussion supra at 33, n.29).

prosecutor to present exculpatory evidence to a grand jury. <u>United States v. Regan</u>, 103 F.3d 1072, 1081 (2d Cir.) (citing <u>United States v. Williams</u>, 504 U.S. 36, 51-52 (1992)), <u>cert. denied</u>, 521 U.S. 1106 (1997). As to petitioner's allegations that the prosecutor elicited perjurious testimony before the grand jury, petitioner notes that the prosecutor failed to present Ms. Justiniano's "prior contrary testimony" or "even try to correct the false testimony given by [Ms. Justiniano]" relating to whether penetration occurred during the incident. (<u>See</u> Petr.'s Mem. at 13, 15-16). Petitioner further indicates that he "suspect[s] that someone coached [Ms. Justiniano] into changing her original story to fit the definition of the crime of sodomy." (<u>Id.</u> at 17). However, as previously noted, a conviction by a petit jury generally renders harmless any errors in the grand jury process.[46] (<u>See</u> discussion <u>supra</u> at 50). Moreover, petitioner has provided no basis for his allegations of collusion, nor has he established that the complainant's grand jury statement was perjurious. <u>See United States v. Bortnovsky</u>, 879 F.2d 30, 33-34 (2d Cir. 1989) (noting that "'[p]resentation of a witness who recants or contradicts his prior testimony is not to be confused with . . . perjury. It [is] for the jury to decide whether or not to credit the witness'") (internal citations omitted). Thus, the state court's denial of petitioner's claims concerning the prosecutor's conduct in the grand jury process was not contrary to, nor an unreasonable application of, clearly established federal law.

7) Prosecutorial Misconduct: Trial

In his seventh claim, petitioner alleges that the prosecutor withheld exculpatory evidence

---

[46]Here, the jury rendered a guilty verdict even after petitioner's counsel introduced trial testimony from Ms. Justiniano's treating physician as to Ms. Justiniano's prior statement indicating that no penetration had occurred. (Tr. at 1129).

and elicited perjured testimony during trial, in violation of petitioner's due process rights. (Petr.'s Mem. at 12-34). It appears that petitioner raised these allegations, albeit in a somewhat convoluted manner, in his pro se Section 440.10 submissions. (See Def.'s 440.10 Br. at 5, 10, 14, 16-17; Defendant's Reply to Prosecutor's Affirmation in Opposition to Defendant's Motion to Vacate Judgment Pursuant to C.P.L. 440.10 ("Def.'s 440.10 Reply Br.") at 5-9).[47] It is questionable whether all of the issues were sufficiently raised in petitioner's application for leave to appeal to the Appellate Division. (See Petitioner's Application for Leave to Appeal his Conviction to the Appellate Division, dated Dec. 30, 2002 ("Def.'s 440.10 Appl."); see also Santos v. Payant, No. 04 CV 8705, 2005 WL 3593577, at *4 (S.D.N.Y. Dec. 30, 2005) (indicating that to appropriately exhaust issues raised in a Section 440.10 motion, a petitioner must seek leave to appeal to the Appellate Division and identify "'the issues on which the application is based'") (internal citations omitted). Given that the claims are plainly meritless, however, the Court respectfully recommends that the claims be denied on the merits even if they were not appropriately exhausted.

Perjury is committed when a witness "gives false testimony concerning a material matter with the willful intent to provide false testimony." United States v. Monteleone, 257 F.3d 210, 219 (2d Cir. 2001) (internal citation omitted), cert. denied, 535 U.S. 1042 (2002). A conviction must be set aside if "'the prosecutor knew, or should have known, of the perjury,'" and "'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" Drake v. Portuondo, 321 F.3d 338, 345 (2d Cir. 2003) (citing United States v. Agurs, 427 U.S.

---

[47]Notably, the post-judgment court did not address these claims (see Decision dated Dec. 3, 2002), possibly because the claims were interspersed with the claims relating to deficiencies in the grand jury process.

97, 103 (1976)). Under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Id.</u> at 87. Where "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,'" the evidence is considered material. <u>Strickler v. Greene</u>, 527 U.S. 263, 280 (1999) (quoting <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985)). Notably, a "reasonable probability" of a different result is established when the non-disclosure "'undermines confidence in the outcome of the trial.'" <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995) (quoting <u>United States v. Bagley</u>, 473 U.S. at 678)).

Petitioner alleges that the prosecutor allowed Ms. Justiniano to commit perjury relating to whether penetration occurred during the incident. (Petr.'s Mem. at 15-17). While petitioner identifies certain inconsistencies between Ms. Justiniano's trial testimony and her earlier statements to the police and the doctor, this alone does not establish the commission of perjury, but merely raises questions about her credibility. Indeed, Ms. Justiniano's inconsistent statements regarding whether there was anal penetration were elicited by petitioner's counsel at trial.[48] Thus, petitioner's claim concerning prosecutorial misconduct as to this testimony is plainly meritless because there is no evidence that the prosecutor withheld exculpatory evidence regarding the witness's statements and because petitioner has not established that Ms. Justiniano committed perjury.

---

[48]Although Ms. Justiniano testified that the petitioner's penis "went like a little bit inside, not much" (Tr. at 534), her treating physician testified that she had previously indicated that there had been "no penetration of the gentleman but he attempted to penetrate into the rectum, into the anus." (<u>Id.</u> at 1129).

Petitioner further alleges that the prosecutor did not attempt to correct the testimony of Steven Glidewell, the State's DNA and forensic serology expert, concerning the probability that petitioner was the source of a certain antigen sample. (Petr.'s Mem. at 22). Specifically, petitioner contends that while Mr. Glidewell testified that one in 28 individuals were possible donors of antigens found in a sample taken from Ms. Justiniano's underwear, an examination of Mr. Glidewell's report reveals that the figure provided is "consistent with the white population." (Id.) Petitioner further contends that Mr. Glidewell's report indicates that one in 66 individuals match the antigen profile in the Puerto Rican population, of which petitioner is a member, and that Mr. Glidewell's testimony was therefore "a lie." (Id.) Mr. Glidewell testified that of the four ethnic groups used, "[t]he *most conservative figure* obtained from his statistical analysis "translates to about one in 28 individuals having that particular profile." (Tr. at 1086). Thus, petitioner's claim of prosecutorial misconduct has no merit, as Mr. Glidewell indicated that he was testifying as to the figure that excluded the least number of people, and petitioner has therefore not established that Mr. Glidewell committed perjury.[49]

While petitioner's Section 440.10 motion raised allegations concerning Detective Kenzik's allegedly false statements that he, and not Detective Tepperman, conducted the photo array, petitioner did not raise this claim in the context of prosecutorial misconduct. (See Def.'s 440.10 Br. at 19-21). At any rate, petitioner's habeas submission provides nothing beyond

_____

[49]Moreover, there is no evidence that the prosecutor withheld exculpatory information relating to Mr. Glidewell's testimony. The Court notes that the petitioner also raises an allegation that "it was never revealed to the jury" during Mr. Glidewell's testimony that Ms. Justiniano "is also a secretor." (See Petr.'s Mem. at 34). It is unclear to the Court whether the petitioner intends this to be a separate claim on which he seeks habeas relief and, if so, on what grounds the claim is made. Accordingly, the Court has not addressed this issue.

petitioner's unsubstantiated conclusions drawn from a report prepared, apparently by a third individual, for the Internal Affairs Bureau months after the photo array was conducted (the "IAB report"),[50] and similar conclusory allegations that the prosecutor was aware of Kenzik's alleged perjury. (See Petr.'s Mem. at 28-30). Thus, his claim is plainly meritless.

Based on a review of the state court proceedings, it does not appear that petitioner previously raised his claims that the prosecutor improperly withheld the IAB report allegedly indicating that Detective Tepperman was the detective who conducted the photo array (see id. at 28-29, 32), and withheld a "complaint report work sheet" detailing Ms. Justiniano's prior description of the assailant. (Id. at 26-27). Nevertheless, despite petitioner's failure to exhaust these claims, the Court finds in any event that the claims lack merit and should be denied.

Petitioner has presented no evidence that the documents were not in fact disclosed to him. Moreover, although the IAB report indicates that Detective Tepperman conducted the photo array on January 8, 1998, the report also states that the complainants "identified the subject officer [referring to petitioner] as their assailant." Thus, while the IAB report, which was apparently not prepared by either Detective Tepperman or Detective Kenzik, may have had some impeachment value, the Court finds that there is no reasonable probability that the outcome of the proceeding

---

[50]The report, dated April 7, 1998 and prepared by the Internal Affairs Bureau states: "On Thursday, January 8, 1998, Detective Gary Tepperman, under the supervision of Sergeant Smith of Queens Special Victims Squad[,] conducted a photo array of Police Officer Jose Velazquez, based on sex crime pattern #7 of 97 in Queens County. This photo array was shown at the 112th Precinct Detective Office to three (03) female complainants[ ] known to this department, who identified the subject officer as their assailant." Petitioner contends, without any evidentiary support, that the IAB report indicates that it was actually Detective Tepperman who conducted the photo array, that "[s]omething very wrong happened . . . requiring somebody else to testify" about the photo array because the "ADA did not like what Tepperman did." (See Petr.'s Mem. at 29-30).

would have been different had the evidence been disclosed to defense counsel. This is especially true given the logical explanation for a third party's error in drafting the IAB report, as Detective Tepperman indicated that he retrieved the photo array from the Internal Affairs Bureau before turning it over to Detective Kenzik to show to the complainants. (Tr. at 662, 676).[51]

Finally, to the extent that petitioner's <u>habeas</u> petition alleges that the prosecution violated the mandates of <u>People v. Rosario</u>, 9 N.Y.2d 286, 173 N.E.2d 881, 213 N.Y.S.2d 448 (1961), in neglecting to turn over the "complaint report work sheet" (Petr.'s Mem. at 26-27), this is a state law claim not cognizable on federal <u>habeas</u> review. <u>See</u> <u>Hoffman v. Kuhlmann</u>, No. 98 CV 3528, 2003 WL 22964466, at *12 (E.D.N.Y. Dec. 1, 2003).

### 8) Illegal Arrest

To the extent that one might read the petition as alleging that petitioner was unlawfully arrested (Petr.'s Mem. at 11 (stating that his "incarceration is illegal")), petitioner's claim is barred from <u>habeas</u> review. After reviewing petitioner's claim that the police lacked probable cause to arrest him, the post-judgment motion court indicated that the claim was one that "the defendant could have raised on direct appeal but unjustifiably failed to do so," and found that the claim was therefore procedurally barred from review. (<u>See</u> Decision of Dec. 3, 2002 at 2 (citing N.Y. Crim. Proc. Law § 440.10(2)(c)). A state court's refusal to review a claim pursuant to Section 440.10(2)(c) constitutes an adequate and independent state ground that precludes <u>habeas</u> review. <u>See</u> <u>Levine v. Commissioner of Corr. Servs.</u>, 44 F.3d at 126. Thus, petitioner may

---

[51]While the State indicates that Detective Tepperman accompanied Detective Kenzik to show the photo arrays to the complainants (Resp. Mem. at 23), Detective Kenzik testified at the <u>Wade</u> hearing that he was accompanied by Detective Locker. (Wade Tr. at 14).

obtain habeas relief only if he can establish either cause and prejudice or that the Court's failure to consider the claim will result in a fundamental miscarriage of justice. Coleman v. Thompson, 501 U.S. at 750. Petitioner has failed to make these showings, and his claim that he was illegally arrested is therefore barred from habeas review.

### 9) Ineffective Assistance of Counsel

Petitioner's ninth claim seeks habeas relief based on assertions of ineffective assistance of counsel. (Petr.'s Mem. at 36-45). Insofar as petitioner's claim involves allegations that his counsel was ineffective because counsel failed to disclose exculpatory evidence and neglected to call alibi witnesses, the Court finds that petitioner appropriately raised the issue before the trial court in his Section 440.10 motion and in his application for leave to appeal. (See Def.'s 440.10 Br. at 25-29; Def.'s 440.10 Reply Br. at 7-8; Def.'s 440.10 Appl).[52] Therefore, these bases for petitioner's ineffective assistance of counsel claim were appropriately exhausted. Moreover, the post-judgment motion court's decision on these issues constitutes a decision on the merits for AEDPA purposes. (See Decision of Dec. 3, 2002 at 2-3).[53]

---

[52]While petitioner's discussion of the ineffective assistance of counsel claim in his application for leave to appeal to the Appellate Division was sparse, these two bases for the ineffective assistance of counsel claims were included in the section detailing the "primary arguments" that he had advanced in his motion to vacate, and the petitioner attached his pro se Section 440.10 motion papers to his application.

[53]The Court notes that there is a split within this Circuit as to whether a post-judgment motion court's reliance on N.Y. Crim. Proc. Law § 440.30(4)(b) (see discussion supra at 6, n.6), constitutes an independent and adequate state procedural bar that precludes the habeas court's review of a petitioner's claims. See Gonzalez-Pena v. Herbert, 369 F. Supp. 2d 376, 388-89 (W.D.N.Y. 2005) (gathering cases detailing the Circuit split on the issue, and concluding that because "Section 440.30(4) specifically states that 'upon considering the merits of the motion, the court may deny it without conducting a hearing' if certain conditions exist, that [a decision

Petitioner's habeas submissions detail additional bases for his ineffective assistance of counsel claim that the State contends have not been appropriately exhausted. Specifically, the State contends that the petitioner has failed to exhaust his claims that his counsel was ineffective because counsel failed to hire an expert witness, failed to investigate the case, failed to obtain all relevant documents, and deprived the jury of a fair opportunity to view and examine evidence withheld by the prosecution by failing to show "'interest'" and properly prepare the case. (Resp. Mem. at 106-107; Petr.'s Att. ¶¶ 47, 48, 53, 54).[54]

"To the extent the claim[s] asserted [in the habeas petition] raise[ ] issues other than those raised in petitioner's 440.10 motion," the issues remain unexhausted. "An assertion in state court of ineffective assistance of counsel does not exhaust all possible bases of an ineffective assistance of counsel claim . . . [but rather] only those specific bases that are raised in state court." Gibbs v. New York, No. 01 CV 5046, 2002 U.S. Dist. LEXIS 25102, at *28 (S.D.N.Y. Sept. 11, 2002) (Report and Recommendation adopted by Gibbs v. New York, No. 01 CV 5046, 2002 U.S. Dist. LEXIS 23922 (S.D.N.Y. Dec. 11, 2002)); see also Jones v. Conway, 442 F. Supp. 2d 113, 123 (S.D.N.Y. 2006); Minor v. Henderson, 754 F. Supp. 1010, 1020 (S.D.N.Y. 1990) (gathering cases). Requiring a petitioner to present all allegations concerning his or her ineffective assistance of counsel claim to the state court enables the post-judgment motion court to evaluate the cumulative effect of the allegations. Reyes v. Phillips, No. 02 CV 7319, 2003

---

pursuant to the Section] is a merits-based decision, not a procedural bar"); see also Lou v. Mantello, No. 98 CV 5542, 2001 WL 1152817, at *9 n.9 (E.D.N.Y. Sept. 25, 2001). The Court finds this analysis persuasive, and will therefore consider the post-judgment motion court's decision to be merits-based.

[54]Citations to "Petr.'s Att." refer to the Petitioner's Factual Attachment, dated January 18, 2004.

WL 42009, at *3 (S.D.N.Y. Jan. 6, 2003) (internal citations omitted).

Bearing in mind the petitioner's pro se status, a review of petitioner's briefs in support of his Section 440.10 motion demonstrates that in fact many of these claims were sufficiently raised before the post-judgment motion court.[55] (See Def.'s 440.10 Br. at 25-29 (alleging, among other things, that defense counsel neglected to produce to petitioner documentation available under the Freedom of Information Law, failed to have a DNA test conducted, neglected to take appropriate steps to secure alibi witnesses, and failed to present or apprise the petitioner of available exculpatory evidence); Def.'s 440.10 Reply Br. at 7 (claiming that "defendant's trial counsel['s] [failure] to follow up on [an] exculpatory report regarding defendant's semen samples constituted ineffective assistance of counsel," and noting that the "Constitution imposes on counsel [the] duty to make reasonable investigations or to make reasonable decision[s] that make[ ] particular investigations unnecessary")). To the extent that petitioner's off-the-record claim that counsel failed to hire an expert witness and other claims may not have been fully exhausted, the Court nonetheless finds them to be without merit.[56]

However, petitioner also alleges that he was denied the effective assistance of trial

---

[55]In making this determination, the Court notes that many of the bases challenged by the respondent as unexhausted are general statements of ineffective assistance of counsel that may be considered part and parcel of the bases discussed in the post-judgment motion court's opinion and raised in petitioner's application for leave to appeal to the Appellate Division. Cf. McDonald v. Smith, No. 02 CV 6743, 2003 WL 22284131, at *11-12 (E.D.N.Y. Aug. 21, 2003) (indicating that dismissal is not required where a new factual basis for an ineffective assistance of counsel claim "'merely "supplements" the ineffectiveness claim and does not "fundamentally alter" it'") (internal citations omitted), aff'd, 134 Fed. Appx. 466 (2d Cir. 2005).

[56]This Court held a hearing on petitioner's claim of ineffective assistance of counsel on May 31, 2005, at which time a sufficient record was developed for the Court to address the petitioner's claims on the merits.

counsel because counsel did not interpose timely objections, thereby failing to preserve certain issues for appeal (Petr.'s Att. ¶ 49), a claim that petitioner does not appear to have previously presented to a state court. Nonetheless, it is clear that petitioner's claim that his trial counsel was ineffective for failing to interpose timely objections is deemed exhausted for purposes of habeas review, as there were sufficient facts on the record to enable the petitioner to raise the issue on direct appeal. Since petitioner unjustifiably failed to raise this claim on direct appeal,[57] and any collateral motion on the issue would be barred under state law, see N.Y. Crim. Proc. Law § 440.10(2)(c); Cruz v. Berbary, 456 F. Supp. 2d 410, 414-15 (W.D.N.Y. 2006), this ground for review is procedurally defaulted. As neither cause for the default nor resulting prejudice has been demonstrated, see Coleman v. Thompson, 501 U.S. at 750, the habeas court may not review the claim.

In order to establish a claim of ineffective assistance of counsel, a petitioner must establish: (1) that trial counsel's performance was deficient in that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) that this deficient performance prejudiced the defense in that the "errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland v. Washington, 466 U.S. 668, 687 (1984). The court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct," and determine whether the acts or omissions identified by the petitioner "were outside the wide range of professionally competent assistance." (Id. at 690). To satisfy the prejudice requirement, petitioner must show

---

[57]The Court notes both that petitioner does not appear to have raised any claims of ineffective assistance of appellate counsel and that petitioner had different trial and appellate counsel.

that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Id. at 694).

Petitioner argues that defense counsel failed to call petitioner's wife and step-daughter as alibi witnesses[58] and failed to apprise petitioner of certain exculpatory material that was present in the DNA report, the doctor's medical report, and statements of the officers involved in the case. (Petr.'s Mem. at 37). Additionally, petitioner argues that he is entitled to habeas relief because his trial counsel failed to investigate the case, failed to examine certain police memo book entries that petitioner alleges demonstrate that Detective Kenzik committed perjury when testifying about the photo array, and failed to conduct a hair and fibers test on a black scarf that Ms. Justiniano described as being present on the floor of the van on the day of the incident and which was ultimately recovered from the van. (Id. at 34-35, 37-39; Petr.'s Reply ¶ 54). Petitioner further contends that rather than testing The Perfect Cover,[59] a book that was allegedly found in petitioner's van, for fingerprints, or attempting to trace its source to prove that it did not belong to petitioner, defense counsel simply advised petitioner not to testify. (Id. at 35-36; Petr.'s Reply ¶ 54). Finally, petitioner indicates that defense counsel was deficient because he failed to hire an independent DNA expert. (Id. at 38-40).

---

[58] Petitioner further indicates that in a separate case, he was charged with public lewdness in Brooklyn for allegedly exposing himself to a woman on the subway. (Petr.'s Mem. at 36). Although another woman on the same train apparently came forward and stated that the petitioner was innocent, petitioner alleges that his counsel never produced this eyewitness. (Id.) It is unclear from petitioner's submissions how he believes this witness's testimony would have been relevant at the trial in this case.

[59] According to petitioner's submission, this book is about an off-duty New York City police officer who raped several women. (Id. at 35).

(a) <u>Exhausted Claim: Alibi Witnesses</u>

Petitioner's counsel's decision not to pursue an alibi defense at trial was a reasonable strategic choice. "[S]trategic choices made by counsel after a thorough investigation of the facts and law are 'virtually unchallengeable,' though strategic choices 'made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" <u>Weeks v. Senkowski</u>, 275 F. Supp. 2d 331, 338-39 (E.D.N.Y. 2003) (quoting <u>Strickland v. Washington</u>, 466 U.S. at 690-91), <u>aff'd</u>, 96 Fed. Appx. 787 (2d Cir. 2004). Even if the Court determined that petitioner's counsel made a strategic decision not to pursue an alibi defense after conducting a less than complete investigation, the known facts rendered it reasonable for counsel to believe that a more thorough inquiry was not required, and thus his actions do not amount to ineffective assistance of counsel.

According to Stuart London,[60] who testified before this Court, neither petitioner nor his wife indicated to counsel that there was a potential alibi defense, despite the fact that Mr. London spoke to Ms. Velazquez "many times about the case" and the petitioner "was active in that if there was an issue he wanted [Mr. London] to analyze, he would bring it to [his] attention."[61]

_____

[60]Throughout the trial, petitioner had three attorneys: Paul London represented petitioner for arraignment purposes; Stuart London represented petitioner through the <u>Wade</u> hearing; and John Tynan served as petitioner's trial counsel. (<u>See</u> Transcript of Hearing held before this Court on May 31, 2005 ("IAC Tr.") at 6, 13-14, 34).

[61]At the hearing before this Court, petitioner's new counsel indicated that at the arraignment, Paul London had represented to the court that petitioner was taking his daughters to dance class at the time of Ms. Justiniano's assault and that petitioner was baby-sitting at the time of the second incident. (IAC Tr. at 6-7). However, the petitioner did not submit a copy of the arraignment transcript to the Court, and Paul London did not testify at the hearing. Instead, petitioner referenced two copies of documents containing handwritten notations that appear to be from the criminal court arraignment in support of his contention that an alibi defense had been advanced at his arraignment. (<u>Id.</u> at 7-8). The first document, which concerns the incident on

(IAC Tr. at 17-20, 24-25, 29). Mr. Tynan similarly testified that petitioner never gave any indication before trial that there were alibi witnesses willing to testify as to petitioner's whereabouts at the time of the incidents. (Id. at 37, 49-50). Moreover, while petitioner's wife indicated to Mr. Tynan that the petitioner had certain habitual behavior from which he would not have deviated, Mr. Tynan's "belief after talking with her was that [the habitual behavior] wasn't an alibi defense." (Id. at 43-46). Indeed, Ms. Velazquez's testimony reinforced that of counsel. She testified that she "just told [Stuart London] that [the petitioner] is always home at 8:30 and there is no way for him to do it, and [she] know[s] he didn't do it, he always takes [her] daughters to the dancing school." (Id. at 65). She also told Mr. Tynan comparable information when the trial began. (Id. at 67-68). This information did not suggest to counsel that petitioner had an alibi for the incidents; indeed, it seems more consistent with habit testimony.[62]

---

December 6, 1997, bears the notations "just finished working" and "w/ wife" in its upper right-hand corner. (IAC Hearing, Pl.'s Ex. 1). The second document bears the notations "Baby sitting kids" and "Alibi" in its upper right-hand corner and references the December 31, 1997 incident. (Id., Pl.'s Ex. 2). The petitioner submitted no evidence as to who wrote the handwritten comments. Stuart London could not recall whether the notations were included on the copies of the documents he reviewed prior to attending the hearing on petitioner's claims of ineffective assistance of counsel. (IAC Tr. at 8). Moreover, while Stuart London indicated that he was sure he had spoken to Paul London about what had transpired during the arraignment, he further testified that he had never learned about any alibi defense advanced at arraignment, and that he only remembered petitioner telling him that he was on his way home from work at the time of one of the incidents. (Id. at 6-10).

[62]The conclusion that the information that Ms. Velazquez provided to counsel was more consistent with petitioner's habits than with a potential alibi defense is reinforced by a statement sworn to by Ms. Velazquez on July 13, 2001 and submitted in connection with the ineffective assistance of counsel hearing held before this Court. (See IAC Tr., Def.'s Ex. A). While this statement was apparently included in petitioner's application for leave to appeal the denial of his post-judgment motion, the respondent indicates that it is unclear whether the exhibit was actually before the post-judgment motion court. (Tarbutton Aff. ¶¶ 31, 33). In her sworn statement, Ms. Velazquez indicates that she "was going to testify at the trial that [her] husband was home" at the time of the December 6th incident, and that she was positive of that assertion because her

After noting that the petitioner's "allegations were merely conclusory and devoid of evidentiary fact," the post-judgment motion court indicated that even if it accepted the petitioner's conclusory allegations as true, it would still "find that under the totality of the circumstances that defense counsel provided [the petitioner] with meaningful representation in that there were strategic reasons for counsel's decision not to have the defendant's wife and daughter testify as alibi witnesses." (See Decision dated Dec. 3, 2002 at 2-3). This Court, having considered petitioner's submissions[63] and the testimony given at the ineffective assistance of counsel hearing, is hard-pressed to find that the post-judgment motion court's decision was contrary to, or an unreasonable application of, clearly established federal law.

---

"husband would always come home at this time[,] a minute more or a minute less[,] but he was always there on time." (IAC Tr., Def.'s Ex. A at 1). She further indicated that her husband would always inform her if he was going to be late. (Id.) Additionally, Ms. Velazquez stated that while her husband would take their daughters to their dancing lessons each Saturday, she would do so when he worked "umbrella overtime" at work, which he did during a few weekends in the month of December. (Id. at 2).

As to the December 31, 1997 incident, Ms. Velazquez provided a more definitive statement of petitioner's whereabouts, indicating that petitioner was at home with his daughters preparing dinner while she was at work. (Id.) She further noted that she and the petitioner asked Stuart London to obtain the telephone records for the period of time before she returned home on that date. (Id.) Mr. Tynan indicated, however, that "[i]f anything came up about telephone records, it was after the verdict but before sentencing [petitioner] said he [had] phone records that would show that [he] didn't do anything[,] but not beforehand." (IAC Tr. at 50). The Court notes that while the record contains an unsworn letter from Joanna Morales, petitioner's step-daughter, indicating that she was at home with the petitioner on December 31, 1997, Ms. Morales was not called to testify at the hearing before this Court.

[63]In a recent submission to the Court, petitioner attached a letter addressed to Stuart London, dated March 19, 1998, that discusses his alibi for December 31, 1997. (See Letter dated Feb. 24, 2007 at 5). This letter was not before the state courts and its authenticity cannot be verified. Thus, the Court has not considered the letter in its analysis.

(b) Exhausted Claim: Disclosure of Exculpatory Evidence

Petitioner's claim that counsel failed to apprise him of certain exculpatory material that was present in the DNA report, the doctor's medical report, and statements of the officers[64] involved in the case is also insufficient to merit habeas review. In finding petitioner's claim to be without merit, the post-judgment motion court indicated that petitioner "failed to provide an affidavit or evidence whatsoever other than his bare assertions and mere conclusory allegations that such information existed and that defendant was unaware thereof." (Decision of Dec. 3, 2002 at 3).

Petitioner has provided no basis for this Court to determine that the decision of the post-judgment motion court was objectively unreasonable. While counsel may violate constitutional standards if he or she fails to consult a criminal defendant and by doing so "materially hampers the fashioning of a defense," Jelinek v. Costello, 247 F. Supp. 2d 212, 273 (E.D.N.Y. 2003), this does not appear to be the case in this instance. Indeed, petitioner has not shown that counsel did not discuss the allegedly exculpatory material with him, or that defense counsel was even in possession of certain of the materials that petitioner now alleges his counsel did not discuss with him. At an even more basic level, petitioner has failed to substantiate his claim as to the mere existence of certain of the allegedly exculpatory evidence.[65]

---

[64]While petitioner does not indicate to what police statements he is referring, petitioner notes that counsel never discussed with him certain entries in Detective Kenzik's memo book. (Petr.'s Mem. at 38; see discussion infra at 67, n.66). It is also possible that petitioner is referring to the IAB report, discussed supra at 56, n.50.

[65]For example, in his Section 440.10 brief, petitioner indicates that defense counsel failed to apprise the petitioner of the fact that the results of the DNA tests were negative, instead indicating at the Wade hearing that the results were "inconclusive." (Def.'s 440.10 Br. at 26). Petitioner has failed to provide any substantiation for his claim that the results were not

66

(c) Potentially Unexhausted Claims

To the extent that petitioner's remaining bases for his ineffective assistance of counsel claim may be unexhausted, they nonetheless lack merit. Petitioner's vague and unsupported allegations concerning counsel's "duty to make [a] reasonable investigation," counsel's failure to "investigate the state's case" (Petr.'s Mem. at 37, 39), and counsel's "lack of 'interest'" in the case as it relates to evidence withheld by the prosecution (Petr. Aff. ¶ 54), do not merit habeas relief. See Powers v. Lord, 462 F. Supp. 2d 371, 381 (W.D.N.Y. 2006) (noting that "'[s]uch undetailed and unsubstantiated assertions that counsel failed to conduct a proper investigation have consistently been held insufficient to satisfy either Strickland prong'") (gathering cases). Additionally, while petitioner alleges that defense counsel was deficient for failing to examine Detective Kenzik's memo book entries (Petr.'s Mem. at 38), he has neither demonstrated that counsel did not, in fact, review those entries, nor has he substantiated his claim that the memo book entries reveal exculpatory or impeachment information.[66]

Petitioner has provided no substantiation for his claim that his trial counsel was

_____

inconclusive. (See discussion infra at 70, n.72).

[66]In his Section 440.10 motion, petitioner indicated that the codes contained in Detective Kenzik's memo book entries from January 9, 1998 reveal that Detective Kenzik was not the individual assigned to conduct the photo array and that he therefore committed perjury when he testified about the photo array during petitioner's trial. (See Def.'s 440.10 Br. at 19-21). However, the photo array was shown to the complainants on January 8, 1998. (Tr. at 1147). It is possible that the petitioner cited to the January 9, 1998 entries because Detective Kenzik originally filed an investigation report, which was later corrected, erroneously indicating that he showed the photo array to the complainants on January 9, 1998. (Petr.'s Mem., Ex. I-1 at 3-4). While petitioner has included what he alleges to be Detective Kenzik's memo book entries from the appropriate date in his habeas submission, petitioner concedes that he "cannot determine[ ] whether [D]etective Kenzik is doing the photo array [on that date], because [it] is not indicated" in the memo book entry, and the entry indicates that Detective Kenzik is "allege[d]ly" on an investigation with Detective Locker. (Id., Ex. I-1 at 2).

ineffective because he did not attempt to trace the origin of The Perfect Cover and advised

petitioner not to testify in light of the prosecution's ability to cross-examine him concerning the

book.[67] (See Petr.'s Mem. at 35-36). Choosing not to have a defendant testify is a strategic

choice that could have been made for a plethora of reasons. Moreover, while the prosecution's

expert in retrieval of hair and fiber samples testified that he recovered a black wool scarf from

the van and submitted it for hair and fibers testing (Tr. at 841-42, 869), it does not appear that

any test results were submitted to the jury.[68] Thus, although the Court declines to find that

defense counsel was deficient in failing to conduct independent testing of the scarf, it is clear that

the deficiency would fall far short of establishing the requisite prejudice under Strickland.[69]

Petitioner's claim that counsel was ineffective for failing to have the DNA evidence

tested by his own expert[70] is also insufficient to merit habeas relief. At the ineffective assistance

of counsel hearing, Stuart London revealed that prior to the discovery of the semen-stained t-

---

[67]After considering the admissibility of the The Perfect Cover, the trial court ruled that the book could not be admitted on the prosecution's direct case, but could be used for cross-examination in the event the petitioner took the witness stand. (Tr. at 776-78).

[68]Indeed, in summation, defense counsel indicated that the results of the hair and fiber expert's efforts were not relayed to the jury. (Id. at 1178). The Court also notes that the petitioner has not elucidated the relevance of the testing in terms of disputing the prosecution's case.

[69]The Court notes that petitioner has not elucidated the relevance of the testing in terms of disputing the prosecution's case.

[70]While petitioner's factual attachment indicates only that defense counsel failed "to hire an expert witness to counter the people's case" (Petr.'s Att. ¶ 47), his habeas petition specifically challenges counsel's failure to hire an expert to assist in evaluating the two DNA tests performed by the respondent's experts. (See Petr.'s Mem. at 38). Although it is unclear, the Court will presume that the petitioner is referring to the DNA testing and protein marker analysis that was introduced by the respondent at trial, although the protein marker analysis is actually a precursor to DNA testing. (Tr. at 1026).

shirt, he had contacted a professor through a fellow attorney to see if testimony would be helpful with respect to the prosecution's lack of conclusive DNA evidence, "because that's what [he] thought would be very important to the jury." (IAC Tr. at 11, 13-15). However, Mr. London noted that the strength of the prosecution's DNA evidence was increased substantially when, without consulting counsel, petitioner contacted the prosecution and alerted them to the existence of the t-shirt containing petitioner's semen in petitioner's vehicle. (Id. at 11, 15-16, 38-40).

When petitioner's trial counsel, Mr. Tynan, was asked to detail the investigatory steps he took concerning the government's forensic evidence and expert testimony, he indicated that he reviewed a case involving DNA evidence that he had previously tried, "did some research on the DNA testing," and reviewed various articles written on the topic. (Id. at 38). Mr. Tynan, who does not have a forensic evidence background, testified that he did not consult an expert because the petitioner had "narrowed the field" by alerting the government to the existence of the t-shirt containing DNA that "matched up to material found" on one of the complainants. (Id. at 38-40). He "believe[d] the evidence of the DNA was really not the strongest argument that Mr. Velazquez had in determining his guilt or innocence in this case" and that "there were other areas to focus attention on which were far more productive." (Id. at 41). Thus, despite the apparently rudimentary knowledge that counsel possessed of the workings of DNA evidence, Mr. Tynan indicates that he made a strategic choice not to consult an expert witness to challenge the prosecution's expert testimony because doing so would not have been the most productive use of his resources.

Even if the Court was to decide that counsel's strategic decision was an unreasonable one, see Gersten v. Senkowski, 426 F.3d 588, 609-610 (2d Cir. 2005) (holding that counsel did not

69

make an "objectively reasonable strategic choice" when he decided, without appropriate investigation, to concede the medical and psychological evidence presented by the prosecution in a child sexual abuse case), cert. denied, 126 S. Ct. 2882 (2006), this basis for petitioner's claim of ineffective assistance of counsel is meritless because the petitioner has not even come close to showing that there is a reasonable probability that the result of the proceeding would have been different in the absence of counsel's errors. "In evaluating the prejudice suffered by a petitioner as a result of counsel's deficient performance, the court looks to the 'cumulative weight of error' in order to determine whether the prejudice 'reaches the constitutional threshold.'" Harris v. Artuz, 288 F. Supp. 2d 247, 256 (E.D.N.Y. 2003) (internal citation omitted), aff'd, 100 Fed. Appx. 56 (2d Cir. 2004). "[W]here there is overwhelming evidence of guilt, even serious errors by counsel will not warrant granting a writ of habeas corpus." Gersten v. Senkowski, 426 F.3d at 611 (internal citation omitted).

Here, the petitioner was identified by both complainants in a photo array[71] and line-up, and both complainants identified petitioner's vehicle as the vehicle driven by the perpetrator. Moreover, items that Ms. Justiniano indicated were located inside the vehicle of her attacker, including a rosary and a scarf, were recovered from petitioner's van. Thus, in the face of the identification evidence and without any indication as to what independent analysis would have revealed[72] or how counsel's cross-examination of the prosecution's experts was deficient,

---

[71]The Court notes that it appears the jury did not hear testimony concerning Ms. Hussein's photo array identification.

[72]As previously noted, the parties entered into a stipulation indicating that the petitioner had undergone a vasectomy prior to December 1997, and that he was therefore unable to produce sperm but could still produce semen. (Tr. at 1113). The State's expert in DNA analysis and forensic biology, Pasquale Buffalino, testified that while examination revealed that semen was

70

petitioner has failed to establish prejudice sufficient to merit <u>habeas</u> relief.

Therefore, the Court respectfully recommends that petitioner's claim that he received ineffective of counsel be denied.[73]

## 10) Remaining Claims

In addition to the various claims already discussed, petitioner raises several claims in his <u>habeas</u> petition that do not appear to have been raised before the State courts and which have therefore not been appropriately exhausted. Petitioner claims, for example, that the trial court violated his right to a fair trial by failing to "review[ ] the evidence in [the prosecution's] files" (Petr.'s Att. ¶ 56), and that the trial court and the Appellate Division violated due process requirements by denying petitioner's motion to vacate without holding a hearing on his claims. (<u>Id.</u> ¶ 58). Finally, petitioner alleges that the Appellate Division should have rendered a "more elaborate decision" on his direct appeal and deprived him of due process by denying and "ignoring" his motion for reargument. (<u>Id.</u> ¶ 60; Petr.'s Mem. at 11).

---

present on the victim's underwear and sweat pants, no sperm cells were visualized on the items. (<u>Id.</u> at 480). The expert later elaborated that the laboratory could not detect any DNA that was consistent with the suspect on either the victim's sweat pants or underwear. (<u>Id.</u> at 499). Thus, the State's DNA evidence itself was inconclusive as to the petitioner's guilt.

[73]In addition to the claims already detailed, petitioner raises an allegation concerning a financial interest that Ms. Justiniano allegedly had in the outcome of his prosecution. It is unclear from petitioner's <u>habeas</u> submission whether he intended to frame this claim in the context of a claim of prosecutorial misconduct or ineffective assistance of counsel. (<u>See</u> Petr.'s Mem. at 36, 44). In his <u>pro se</u> Section 440.10 submission, petitioner raises the claim, albeit briefly, in his allegations concerning the deficiencies of his trial counsel. (Def.'s 440.10 Br. at 27). At any rate, petitioner has provided no evidence to support his allegations that Ms. Justiniano was financially vested in his prosecution, nor any detail concerning the deficiencies of trial counsel and/or the prosecution in this regard. Thus, the Court has not considered this allegation as a formal claim.

The State argues that these claims have not been exhausted because they have never been presented to the state court for review.[74] (Resp. Mem. at 106-07). Moreover, the State asserts that it does not expressly waive the exhaustion requirement[75] with respect to these, or any other, of petitioner's claims. (Id. at 107). Indeed, since petitioner failed to fairly alert the state courts of these federal constitutional claims, the claims are not exhausted. O'Sullivan v. Boerckel, 526 U.S. at 845 (holding that "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process"); see also Pesina v. Johnson, 913 F.2d at 54 (stating that "the exhaustion requirement mandates that federal claims be presented to the highest court of the pertinent state before a federal court may consider the petition"); Orraca v. Walker, 53 F. Supp. 2d 605, 609 (S.D.N.Y. 1999); Cowans v. Artuz, 14 F. Supp. 2d 503, 505 (S.D.N.Y. 1998).

The State has not elucidated its position concerning procedural default, and at this point, it is unclear whether petitioner is procedurally barred from pursuing some of the unexhausted claims in a collateral proceeding before the state court. However, given the Court's discretion to deny unexhausted claims on the merits, 28 U.S.C. § 2254(b)(2), and the fact that petitioner's unexhausted claims are "plainly meritless," see Rhines v. Weber, 544 U.S. at 277 (holding that it would be an abuse of discretion to grant a stay where the petitioner's unexhausted claims in a

---

[74]Petitioner's factual attachment also details claims that the Appellate Division applied the wrong legal standards in reviewing both his direct appeal and his motion to vacate judgment (See Petr. Aff. ¶¶ 57, 59), which the Court has implicitly addressed in its recommended resolution, as detailed above, of petitioner's exhausted claims.

[75]According to 28 U.S.C. 2254(b)(3), "[a] State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement."

"mixed" petition are plainly meritless), the Court respectfully recommends that petitioner's unexhausted claims be denied on the merits.

To begin, petitioner's claim that the "trial court failed to conduct a proper assessment of the People's case by not reviewing the evidence in their files, thus violati[ng] the defendant's right to [a] fair trial" (Petr.'s Att. ¶ 56), is entirely without merit. Petitioner fails to cite any authority to support his claim that the court is required to conduct an independent review of the prosecutor's case, nor has he indicated what evidence would have been discovered in such a review or how that would have affected the outcome of his trial.

Moreover, courts in this Circuit have held that "'[p]rocedural errors in state post-conviction proceedings are not cognizable on federal habeas review.'" Savinon v. Mazucca, No. 04 CV 1589, 2005 WL 2548032, at *37-38 (S.D.N.Y. Oct. 12, 2005) (internal citation omitted) (gathering cases) (Report and Recommendation adopted by Savinon v. Mazucca, No. 04 CV 1589, 2006 WL 2669331 (S.D.N.Y. Sept. 18, 2006)); see also Jones v. Duncan, 162 F. Supp. 2d 204, 217-19 (S.D.N.Y. 2001); Diaz v. Greiner, 110 F. Supp. 2d 225, 235-36 (S.D.N.Y. 2000) (holding that petitioner's "unsupported assertion that the trial court denied his (third) CPL § 440.10 motion without a hearing violated due process is not cognizable on federal habeas review"). Therefore, petitioner's claim that the trial court and the Appellate Division denied him due process by ruling on his Section 440.10 motion without a hearing is also plainly meritless.

Petitioner also alleges that his due process rights were violated when the Appellate Division denied and "ignored" his motion for reargument[76] and failed to issue an elaborate

--------

[76]New York law permits the Appellate Division, in its discretion, to allow reconsideration or reargument of an appeal after its original determination has been made. N.Y. Crim. Proc. Law § 470.50.

decision on his direct appeal. (Petr.'s Att. ¶ 60; Petr.'s Mem. at 11, 47, 58; Tarbutton Aff. ¶ 21). Federal law does not guarantee the right to appeal state criminal convictions. See Jones v. Barnes, 463 U.S. 745, 751 (1983); Lovacco v. Stinson, No. 97 CV 5307, 2004 WL 1373167, at *11 (E.D.N.Y. June 11, 2004). Therefore, because petitioner does not allege that the Appellate Division denied his motion for reargument because he lacked counsel or on account of his indigency, his claim would be ineligible for habeas review even if appropriately exhausted. See Lovacco v. Stinson, 2004 WL 1373167, at *11. Petitioner's allegation concerning the brevity of the Appellate Division's decision is similarly meritless.

Therefore, the Court respectfully recommends that petitioner's unexhausted claims be denied on the merits.

## CONCLUSION

For the reasons set forth above, this Court respectfully recommends that the petition for a writ of habeas corpus be denied in its entirety. The Court further respectfully recommends that petitioner be denied a certificate of appealability, as he has not "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); see also Middleton v. Attorneys Gen. of States of N.Y. and Pa., 396 F.3d 207, 209 (2d Cir. 2005) (noting that to merit the issuance of a certificate of appealability, a petitioner "must show that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further") (internal citations and quotation marks omitted).

Any objections to this Report and Recommendation must be filed with the Clerk of the

Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; Small v. Secretary of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to send copies of this Report and Recommendation to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED**.

Dated: Brooklyn, New York
      May 11, 2007

Cheryl L. Pollak
United States Magistrate Judge